In re Richard A. KAMSTRA, d/b/a Nautilus Fitness Center, and Shirlee A. Kamstra, Debtors.

Gordon F. FORELL, Trustee, Plaintiff,

v.

KENT COUNTY TREASURER and City of Grand Rapids Treasurer, Defendants.

Bankruptcy No. HG 83 00581.
Adv. No. 84 0376.

United States Bankruptcy Court,
W.D. Michigan.

July 30, 1985.

Day, Sawdey, Flaggert and Porter, Larry A. Ver Merris, Grand Rapids, Mich., for plaintiff.

Law, Weathers and Richardson, James E. Christenson, Grand Rapids, Mich., for Kent County.

Daniel A. Ophoff, Grand Rapids, Mich., for Grand Rapids.

## OPINION

LAURENCE E. HOWARD, Bankruptcy Judge.

### SECTION 724(b) and FIFTH AND TENTH AMENDMENTS TAX CLAIMS AS ADMINISTRATIVE EXPENSES

The trustee, Gordon Forell, has brought a complaint against Kent County and the City of Grand Rapids by which he seeks to subordinate the tax claims and liens of these entities to the estate's administrative expenses under Section 724 of the Bankruptcy Code. In response the City and County assert that Section 724 violates the Fifth and Tenth Amendments to the United States' Constitution, and that at least some of the outstanding taxes were incurred by

**1.** The stipulation gave this total as $3,891.00.

the estate and therefore constitute administrative expenses also.

Pursuant to the Trustee's motion for summary judgment the parties have submitted this case upon briefs and an agreed stipulation of facts. The following statement of the facts of the case is taken from that stipulation.

The Debtors, Richard A. Kamstra, doing business as Nautilus Fitness Center, and Shirlee A. Kamstra, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on March 2, 1983. Mr. Forell is the duly appointed trustee in this proceeding. Among the assets of the estate were certain items of personal property of the Debtor, consisting of weight lifting equipment, and a parcel of real estate. As commonly occurs, the trustee undertook to sell these assets.

The weight lifting equipment was sold pursuant to an order of this Court on October 25, 1983, for the sum of $2,100.00. The order of this Court had specified that the sale was to be free and clear of all liens and claims of any party, and such interests were to attach to the proceeds in the same order of validity, rank and priority as those interests held with respect to the personal property. The City of Grand Rapids claims such an interest, in the nature of a claim for assessed personal property taxes due and owing as of June, 1984, as follows:

| | |
|---|---|
| 1980 Summer Taxes | $ 379.22 |
| 1980 Winter Taxes | 201.51 |
| 1981 Summer Taxes | 805.22 |
| 1981 Winter Taxes | 137.01 |
| 1982 Summer Taxes | 904.77 |
| 1982 Winter Taxes | 142.27 |
| 1983 Summer Taxes | 1,201.52 |
| 1983 Winter Taxes | 119.89 |
| Total | $3,891.41 [1] |

As to the parcel of real property, this Court entered an order on October 4, 1983, which provided for an option to purchase upon certain conditions, among which was the condition that the property be sold free and clear of all liens or claims, with any such interest attaching to the proceeds in the same order of priority, validity and

rank. On November 1, 1983, this Court entered an order approving the option agreement upon the proposed conditions as no objections had been filed. In early January, 1984, the holder of the option to purchase decided to exercise it. The trustee then attempted to obtain title insurance as required by the option. A requirement for issuance of a title insurance policy was that all outstanding liens on the property be paid and otherwise discharged. Among the liens upon this property as of the end of January, 1984, were liens for taxes due to the Kent County Treasurer as set out below:

| | |
|---|---|
| 1980 Summer and Winter Taxes | $1,499.48 |
| 1981 Summer and Winter Taxes | 1,675.68 |
| 1982 Summer and Winter Taxes | 1,447.96 |
| Total | $4,623.12 [2] |

Also due and owing upon this property as of the end of January, 1984, were the following real estate taxes owing to the City of Grand Rapids Treasurer:

| | |
|---|---|
| 1983 Summer Taxes | $1,430.51 |
| 1983 Winter Taxes | 143.38 |
| Total | $1,573.89 |

The Kent County Register of Deeds would not accept for recording purposes any deeds or documents necessary for the closing until the above real estate tax liens and claims had been paid.

The trustee believed that the claims and liens were discharged by this Court's previous orders and returned here for reassurance. On January 17, 1984, this Court entered an order providing, *inter alia,* that Kent County and Grand Rapids forever discharge from their tax rolls the real estate tax obligations described above, that the claims and liens of the county and city would attached to the proceeds of the sale, and that the county and city shall never assess or reassess the real property or the new owner for those obligations. Nevertheless, the Register of Deeds continued to refuse to accept for recording the documents necessary to close the sale. Fear-

ing that the sale would be lost unless closed by February 15, 1984, Mr. Forell decided it would be necessary to pay the tax obligations at the closing from the proceeds. On February 13, 1985, he obtained from this Court an order allowing the payment of the tax claims but preserving his right to subrogate those claims under Section 724. This order was reaffirmed by a February 29, 1984, order of this Court that reinstated the order of February 13, with slight modifications.[3]

The parties agree that all the property, real and personal, described above was property of the estate and was subject to a lien to secure an allowed claim for taxes for the years up to 1982, which lien cannot be avoided under the Bankruptcy Code. The parties differ over the status of the city real and personal property taxes assessed December 31, 1982, and levied July 1, 1983, (Summer, 1983) and December 1, 1983 (Winter, 1983).[4] The City maintains that these taxes became liens upon the property when levied, pursuant to M.S.A. § 7.81 [M.C.L.A. § 211.40]. The trustee asserts that these are merely tax claims which were prevented from becoming liens by the automatic stay of Section 362 of the Bankruptcy Code.

During the administration of this estate administrative expenses allowable under Section 507 have accrued in an amount in excess of the value of the remaining property after payment of the tax liens and claims mentioned above. These expenses include fees for the Trustee and his attorneys. The parties agree that should this Court subordinate the tax liens under Section 724 there will not be sufficient funds to pay any part of those taxes after payment of the administrative expenses.

By their arguments the parties have put three issues before the Court. These are:

—whether Section 724(b) of the Bankruptcy Code works a taking in viola-

---

**2.** The stipulation gave this total as $4,623.04.

**3.** The sale of the real estate was apparently closed, but the stipulation does not disclose the amount paid for the property.

**4.** The stipulation does not explain why the County has no tax claim or lien for 1983.

tion of the Fifth Amendment to the United States' Constitution if the operation of that section precludes any payment upon the tax claims and liens due and owing to the County and City;

—whether Section 724(b) of the Bankruptcy Code impermissibly intrudes upon a state's interest in its revenues in violation of the Tenth Amendment to the United States' Constitution; and

—whether the 1983 taxes are post-petition taxes which qualify as Section 503(b) administrative expenses.

I. Whether Section 724(b) of the Bankruptcy Code works a taking in violation of the Fifth Amendment to the United States' Constitution if the operation of that section precludes any payment upon the tax claims and liens due and owing to the County and City.

■■■ The United States' Constitution provides at Article I, § 8, cl. 4 that: "The Congress shall have Power ... to establish ... uniform laws on the subject of Bankruptcies throughout the United States." However, this power is not unfettered. As the Supreme Court recognized in *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), Congress's power to establish a uniform bankruptcy law is subject to the prohibitions of the Fifth Amendment, *Id.* at 589, 55 S.Ct. at 863, which includes among its list of proscribed acts "nor shall private property be taken for public use, without just compensation." These two clauses of the Constitution establish the parameters of our discussion.

This dispute arose from a situation common in bankruptcy: the court ordered the sale of assets free and clear of all liens and encumbrances, with such interests to attach to the proceeds of the sale in the same order of rank, validity and priority they held with regard to the asset itself. The power to order such a sale has "long been exercised by federal courts sitting in equity when ordering sales" and had been authorized either explicitly or implicitly by the predecessors to the present Bankruptcy Code. *Radford,* 295 U.S. at 583–584, 55

S.Ct. at 860. Despite the clear precedent for this Court's orders as to the sale, the County Register of Deeds has not complied. The city and county now raise the Fifth Amendment just compensation clause in their defense and the trustee contests the applicability of the clause.

For analysis of the argument, the clause in question might be broken down into four parts: 1) private property; 2) taken; 3) for public use; 4) without just compensation.

The parties agree that there will be no compensation for the City and County if their liens are subordinated. Payment of the administrative expenses would exhaust the estate, and to the extent that the City and County may be said to retain their liens they may be said to own hollow husks. However, the trustee contests the applicability of the other three concepts to this case.

■■■ As to the property element, it is unclear whether the trustee denies that the liens are property, that they are private property, or both. In any case the Court cannot agree with him. Liens created by state law are enforceable interests compensable under the Fifth Amendment. *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). The fact that the owners of these interests are a city and a county does not make the liens "public" property as opposed to "private" property for Fifth Amendment purposes. Municipalities and state agencies have long been able to recover compensation under the Fifth Amendment for property taken for federal use without just compensation. See, e.g., *Town of Clarksville, Virginia v. United States,* 198 F.2d 238 (4th Cir.1952), *cert. denied* 344 U.S. 927, 73 S.Ct. 495, 97 L.Ed. 714 (1953); *City of Fort Worth, Texas v. United States,* 188 F.2d 217 (5th Cir.1951).

■■■ The trustee also objects to the applicability of the "for public use" phrase to this case; he denies that the subordination is for public use, but rather asserts that it is for the "private use of private claimants." Plaintiff's Brief at 17. Again, this

Court cannot agree. The Supreme Court, considering the constitutionality of a New York ordinance which required landlords to allow cable television companies to install their equipment, has written that "[a] permanent physical occupation authorized by state law is a taking without regard to whether the state, or instead a party authorized by the State, is the occupant." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n. 9, 102 S.Ct. 3164, 3174 n. 9, 73 L.Ed.2d 868 (1982). The question of who benefits is irrelevant, for "the courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). Clearly, then subordination would deprive the city and the county of private property for public use without just compensation.

■ The only remaining question is whether subordination constitutes a taking in violation of the Fifth Amendment. The Supreme Court has recognized that the definition of a "taking" poses a question of "considerable difficulty" and the Justices have admitted that they have been "unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 (1978). Not every destruction or injury to property by the government is a "taking" in the constitutional sense. *Armstrong*, 364 U.S. at 48, 80 S.Ct. at 1568 (1960). The determinative factor is "the character of the invasion." *United States v. Cress*, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917). The validity of the government's acts depends upon the particular facts of the case. The most significant facts are: the economic impact of the act upon the claimant; the extent to which the act interferes with distinct investment-backed expectation; the character of the action, as a "taking" will be more readily found in a physical invasion "than when interference

arises from some public program adjusting the benefits and burdens of economic life to promote the common good;" and whether the act interferes with interests "sufficiently bound up with the reasonable expectations of the claimant to constitute property." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659.

■ Considering these criteria, this Court concludes that subordination of the tax liens under § 724(b) does not work a "taking" in the constitutional sense. The city and county have not shown any significant economic impact upon them resulting from the subordination of these tax liens and claims. The Court has not been shown, and doubts whether, the volume of bankruptcies in Kent County threatens to erode the entire tax base or some large portion of it. Nor does § 724(b) interfere with distinct investment-backed expectations. City and county services to a parcel of real estate are not an "investment" and taxes are not a "return" on that investment. The operation of § 724(b) resembles the interference which "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Neither does § 724(b) interfere with any interest of the city or county sufficiently bound up with other reasonable expectations to constitute property. The 1978 Bankruptcy Code, of which § 724(b) is a part, was enacted on November 6, 1978, and became effective October 1, 1979. The subordination of tax liens to administrative expenses worked by § 724(b) is an expansion of the principle of § 724(b)'s predecessor, § 67(c)(3) of the Bankruptcy Act. That provision of the Act subordinated tax liens on personal property when unaccompanied by possession. Section 724(b) applies to both real and personal property taxes and does not require that the lien be unaccompanied by possession. Since the earliest liens claimed by the city and county date from 1980 and resulted from an assessment as of December 31, 1979, M.S.A. § 7.2 [M.C.L.A. § 211.2], all these liens were taken subject to notice that they might be subordinated in any

eventual bankruptcy. Indeed, the Bankruptcy Clause itself authorizes a Court of Bankruptcy to affect the rights of lienholders in many ways. *Wright v. Vinton Branch of Mountain Trust Bank,* 300 U.S. 440, 470, 57 S.Ct. 556, 565, 81 L.Ed. 736 (1937). When these liens arose the city and county could not have held a reasonable expectation that the liens could never be subordinated.

This result is reinforced by reference to other areas of bankruptcy law. The Supreme Court held that Congress' authority under the Bankruptcy Clause of the Constitution "includes the power to discharge the debtor from his contracts and legal liabilities as well as to distribute his property." *Hanover National Bank v. Moyses,* 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902). More recent cases have upheld the constitutionality of the exemptions created by § 522(f) of the Bankruptcy Code when claimed against liens created after enactment of the Code but before the effective date. See *Teske v. General Finance Corporation (In the Matter of Teske),* 9 B.R. 18 (Bkrtcy.W.D.Mich.1981); *Weber v. Credithrift of America, Inc. (In re Weber),* 674 F.2d 796 (9th Cir.), *cert. denied,* 459 U.S. 1086, 103 S.Ct. 567, 74 L.Ed.2d 931 (1982); *Commonwealth National Bank v. United States (In re Ashe),* 712 F.2d 864 (3rd Cir.1983); *United States v. C.I.T. Financial Services, Inc. (In re Archuleta),* 707 F.2d 451 (10th Cir.1983). If the Congress may discharge a debtor from his legal liabilities and exempt a debtor's property from the lien rights of a creditor, the Congress may also rearrange under § 724(b) the priorities it has created under the Bankruptcy Code in order to insure that the administrative fees are paid. If the Congress could not do that the administration of bankruptcy cases would cease. Subordination under § 724(b) then is not a "taking" but rather "a mere 'consequential incidence' of a valid regulatory measure." *Armstrong,* 364 U.S. at 48, 80 S.Ct. at 1568.

II. Whether Section 724(b) of the Bankruptcy Code impermissibly intrudes upon a state's interest in its revenues in violation of the Tenth Amendment to the United States' Constitution.

■ The city and county, relying upon their status as subdivisions of the State of Michigan, have alleged that subordination under § 724(b) intrudes upon an attribute of state sovereignty fundamental to the very existence of state and local government, the power to levy and collect taxes. Defendant Kent County's Brief at 17. To support their position the defendants argued by analogy to the Commerce Clause, which the Supreme Court held was limited by the Tenth Amendment in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In *National League of Cities,* the Supreme Court held that Congress' extension of the minimum wage and maximum hour provisions of the Fair Labor Standards Act to state and local government employees violated the Tenth Amendment, which provides that:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states, respectively, or to the people.

Although the Constitution delegates the power to regulate interstate commerce to the Congress, the Supreme Court held that Congress could not use that power to impose its choices and displace state choices as to how a state will administer its traditional functions.

Whatever the merits of the defendants' arguments might have been under *National League of Cities* that case no longer guides this Court. While this adversary proceeding was under advisement, the Supreme Court issued *Garcia v. San Antonio Metropolitan Transit Authority,* —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), which overrules *National League of Cities.* In *Garcia* the Supreme Court rejects the concepts of "integral" or "traditional" functions embraced by the *National League of Cities* court as rules of state immunity from federal power. 105 S.Ct. at 1016. The *Garcia* court agrees that states

have a special position in our federal union, but held that protection of that position depends upon "the federal political process" rather than upon "discrete limitations on the objects of federal authority." 105 S.Ct. at 1018. The *Garcia* court wrote that:

> ... we are convinced that the fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the 'States as States' is one of process rather than one of result. Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a 'sacred province of state autonomy.' *EEOC v. Wyoming,* 460 U.S. [226] at 236 [103 S.Ct. 1054 at 1060, 75 L.Ed.2d 18].

105 S.Ct. at 1019–20.

It is true that in *Garcia* the Supreme Court was considering only the Congress's power to regulate interstate commerce and did not address the Congress's power to establish a uniform bankruptcy law. However, this Court believes the *Garcia* analysis is applicable to both powers, as both are powers delegated to the Congress by the Constitution. According to *Garcia* a court may place a substantive restraint on an exercise of the Congress's delegated powers that impinges upon the sovereignty of the states, but only if such a restraint is justified by the procedural nature of the federal structure of the Constitution, and only if such a restraint is tailored to compensate for possible failings in the national political process. This Court understands that to mean it could impose a substantive restraint, such as holding subordination under § 724(b) unconstitutional when it precludes payment of local taxes, only if it were satisfied that the interests of local and state government in their tax revenues inherently could not have been represented in Congress or "the national political process" and that such a holding compensated for that failure of the process to consider the need of local and state government for tax revenues.

This court does not believe such a situation exists here. Section 724(b) draws no distinctions between local, state or federal tax liens. Congress chose to allow any of them to be subordinated. Therefore, to the extent that the interest of the federal government in revenue is identical with that of state and local government, the court believes that the state interests were represented in Congress and were not discriminated against or ignored. Section 724(b) does not violate the Tenth Amendment as that amendment is presently viewed from the perspective of the *Garcia* opinion.

III. Whether the 1983 taxes are post-petition taxes which qualify as Section 503(b) administrative expenses.

Having cleared away the constitutional objections to § 724(b) we turn now to the actual implementation of that section. The parties have stipulated that the estate's property, both real and personal, "was property in which the estate had and has an interest and that is and was subject to a lien that is not avoidable under Title II (sic), United States Code, and that secured an allowed claim for taxes for years 1982 and before." Stipulation, paragraph 17 at page 6. In effect the parties have stipulated to all the predicates for the subordination of the taxes for 1982 and prior years to the trustee's administrative expenses under 724(b). As the court has sustained § 724(b) against the constitutional challenges mounted under the Fifth and Tenth Amendments, and as the Court concurs that the requirements for subordination are fulfilled as to the taxes for 1982 and before, the Court holds that those taxes are subordinated to the trustee's administrative expenses under § 724(b).

The 1983 taxes however, present a somewhat different situation. These taxes, both real and personal, were assessed December 31, 1982. The Kamstras' filed their petition for relief under Chapter 7 of Title 11, United States Code, on March 2, 1983. The

City[5] contends that these taxes became liens on July 1 and December 1 of 1983 and that they were incurred by the estate and therefore constitute administrative expenses entitled to the same status as the trustee's other administrative expenses. The trustee contends that the automatic stay prohibited these claims from becoming liens and that the taxes were not incurred by the estate because the trustee did not continue to operate the debtors' business.

The question of whether the automatic stay prohibited the 1983 tax claims from becoming liens is irrelevant to a resolution of this case. If the 1983 taxes are secured by liens but were not incurred by the estate they are no better off than the pre-1983 tax liens subordinated above to the Trustee's administrative expenses. Conversely, if the 1983 taxes remained mere claims but were incurred by the estate that would be sufficient to qualify them as § 503(b)(1)(B)(i) administrative expenses, thereby avoiding subordination under § 724(b). The resolution of this case therefore turns upon the determination of whether the 1983 taxes were incurred by the estate.

Section 724(b) subordinates tax liens to any claim specified in Section 507(a)(1)–(5).[6] Section 507(a)(1) confers a first priority upon administrative expenses allowed under section 503(b). Section 503(b)(1)(B)(i) allows as an administrative expense a claim for any tax incurred by the estate, except for a tax which fits the specifications of section 507(a)(6). According to the specifications set forth in § 507(a)(7)(B) such an excluded tax is a property tax assessed before the commencement of the case and last payable without penalty after one year before the filing of the petition. The 1983 personal and real estate taxes were assessed on December 31, 1982. M.S.A. § 7.2 [M.C.L.A. § 211.2]. The Kamstras' petition

under chapter 7 was filed on March 2, 1983. Stipulation, paragraph 1, page 1. The tax bills were mailed on July 1st and December 1st, 1983. M.S.A. §§ 7.89, 7.95 [M.C.L.A. §§ 211.45, 211.51]. The 1983 taxes are property taxes assessed two months before the commencement of the case and were last payable without penalty after March 2, 1982, which was one year before the filing of the petition. These taxes fit within § 507(a)(6) and, therefore, do not qualify as administrative expenses.

The intent and design of the Bankruptcy Code and Michigan law sustain this conclusion. As another Bankruptcy Court has held:

> The court determines that section 503(b)(1)(B)(i) should be interpreted as denying administrative claim status to taxes that are not incurred in the operation of the debtor's business *after* the filing of the petition ... Thus, a tax given priority status under section 507(a)(6) and predicated on pre-petition liability incurred by the debtor *before* the filing of the petition should not be promoted to a first priority administrative expense merely because it is assessed after the petition is filed.

*In re Westholt Manufacturing, Inc.,* 20 B.R. 368, 371 (Bkrtcy.D.Kansas, 1982). (emphasis in original) *Collier's* is of the opinion that in § 503(b)(1)(B)(i) Congress meant "that to the extent a debtor's prepetition liability became a tax claim after the petition, it would not for that reason be given administrative expenses status under section 503(b)(1)(B)." 3 *Collier on Bankruptcy* paragraph 503.04, at 503–24 (15th ed. 1985). Section 502(i) provides indirect support to this court's conclusion: that section provides that although a claim for a tax incurred pre-petition arises post-petition, it will nonetheless be treated as a

---

**5.** As the County taxes are all for 1982 and before, only the City has a claim for 1983 taxes.

**6.** The Bankruptcy Amendments and Federal Judgeship Act of 1984 amended § 507. This opinion shall refer to § 507 as it was before that amendment because § 553(a) of the 1984 Act,

Pub.L. No. 98–353, provided that the amendments, with some exceptions irrelevant here, would only apply to cases filed after 90 days after enactment. That cut off day is October 8, 1984, and this case was commenced on March 23, 1983.

pre-petition claim. As observed in *Collier's:*

> All section 502(i) really does is make plain that a tax claim entitled to priority under section 507(a)(7), even though it arises after the commencement of the case and, therefore, might logically be entitled to administrative status under section 503(b) and, therefore, a first priority under section 507(a)(1), is allowed, to the extent allowable "as if such claim had arisen before the date of the filing of the petition." The allocation of such status as a pre-petition claim denies administrative status.

3 *Collier on Bankruptcy*, paragraph 502.-09, at 502–102, n. 1 (15th ed., 1985).

Under Michigan state law, "[t]he taxable status of persons and real and personal property shall be determined as of each December 31, which shall be deemed the tax day." M.S.A. § 7.2 [M.C.L.A. § 211.2]. Michigan law also provides that all taxes become a debt due to the city and county from the owner, or person otherwise assessed, on the tax day. M.S.A. § 7.81 [M.C.L.A. § 211.40]. See Charter of the City of Grand Rapids, § 166 at page 50;[7] also *Callaghan's Mich.Civ.Jur.*, Taxes § 303 (1985). Therefore, the taxes the parties have labelled as Summer, 1983 and Winter, 1983, were based on a tax day of December 31, 1982, and were a debt due from the Kamstras' to the city from that day. These taxes were not incurred by the estate.

Assuming *arguendo* that the 1983 taxes did achieve lien status, they would nonetheless be subordinated to the trustee's administrative expenses like the taxes for 1982 and before. If the 1983 taxes did not achieve lien status they fell even further behind the trustee's expenses, to a seventh priority under § 507(a)(7)(B). Were there sufficient funds available to pay some of the taxes, the question of the exact status of the 1983 taxes would take on some importance. But as the parties have stipu-

lated that there will not be sufficient funds to pay even a portion of the trustee's expenses (stipulation, paragraph 19, at page 7), the question is moot.

## CONCLUSION

Under Section 724(b) the expenses of the trustee, Gordon Forell, take precedence over all the tax claims and liens asserted by the City of Grand Rapids and Kent County. This subordination of all the tax claims and liens does not violate either the Fifth or the Tenth Amendments to the Constitution of the United States. None of the taxes claimed constitute administrative expenses of the estate.

---

7. The Charter of the City of Grand Rapids provides at § 166 that, in part, "The taxes thus assessed shall become at once a debt to the City from the persons against whom they are assessed."