**EQUIBANK, N.A. and the Farmers' Home Administration, Appellants,**

v.

**WHEELING–PITTSBURGH STEEL CORPORATION, Appellee.**

No. 88–3664.

United States Court of Appeals, Third Circuit.

Argued Feb. 10, 1989.

Decided Aug. 22, 1989.

John R. Bolton, Asst. Atty. Gen., J. Alan Johnson, U.S. Atty., Bea L. Witzleben (argued), J. Christopher Kohn, Tracy J. Whitaker, U.S. Dept. of Justice, Washington, D.C., for Farmers' Home Admin.

Peter N. Pross, Kincaid & McGrath, P.C., Pittsburgh, Pa., for Equibank.

Joan G. Dorgan (argued), Juliet E. Boniface, V. Suzanne Cook, Ronald W. Schuler, Buchanan Ingersoll, P.C., Pittsburgh, Pa., for Wheeling–Pittsburgh Steel Corp.

Before SLOVITER and BECKER, Circuit Judges, and POLLAK, District Judge.*

OPINION OF THE COURT

BECKER, Circuit Judge.

This bankruptcy appeal presents a number of involved questions of state (West

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania sitting by designation.

Virginia) lien law and bankruptcy priority law. Certain pre-petition and post-petition real and personal property taxes in various states of lien perfection were paid, pursuant to a Bankruptcy Court-approved agreement for the sale of a steel mill owned by a Chapter 11 debtor in possession, out of the proceeds of sale. The question before us is whether the taxes should have been borne by the debtor-in-possession as a first priority administrative expense or a seventh priority expense payable out of the general fund of the estate, or by the secured creditor. Both the bankruptcy and district courts held that all real and personal property taxes due on the property in question, regardless of their lien status, were payable out of the sale proceeds received by the secured creditor appellants, Equibank, the lender, and the United States ("secured creditors"), which guaranteed the defaulted loan through the Farmers Home Administration,[1] rather than by the Chapter 11 debtor-in-possession, appellee Wheeling–Pittsburgh Steel Company ("Wheeling–Pitt").

Appellants remonstrate that the challenged decision deprives them of the adequate protection to which they are entitled as secured creditors and depreciates their security by reason of the mere passage of time and by charging them with tax payments which did not benefit them. Appellants contend that this is improper, or at least that the Bankruptcy Court erred in failing to conduct a hearing under section 506(c) of the Bankruptcy Code, 11 U.S.C. § 506(c), to determine whether the taxes conferred any benefit on the secured creditor, before making its decision.

Wheeling–Pitt rejoins first that the 1985 real estate taxes in question were perfected liens, clearly chargeable to the secured creditors out of the proceeds of sale. Second, it submits that the other taxes in question: (a) post-petition (hence post-automatic stay) real estate taxes; and (b) pre-petition and post-petition personal property taxes, should not be paid out of the general fund because that would create a windfall for the secured creditors. In Wheeling–

Pitt's submission, the equitable powers of the Bankruptcy Court under Sections 105 and 363 of the code militate against such a result. Moreover, it contends that requiring payment out of the estate would deter Chapter 11 debtors from selling property, resulting in the frequent abandonment of property to secured creditors who would be forced to sell at foreclosure sales out of which the taxes would have to be paid to furnish clear title, thus confirming the appropriateness of making the secured creditor responsible for taxes.

Although we agree that the secured creditors must bear the onus of payment of those real estate taxes that became liens prior to the filing of the bankruptcy petitions, and affirm on that point, in all other respects we will reverse and remand for hearings and findings under §§ 503 and 506(c) of the Code.

## I. FACTS AND PROCEDURAL HISTORY

Wheeling–Pitt owned and operated a steelmaking facility in Benwood, West Virginia ("Benwood plant") which produced steel pipe. In 1984 Wheeling–Pitt shut the plant and began looking for a purchaser. On April 16, 1985, Wheeling–Pitt filed a petition under Chapter 11 of the Bankruptcy Act resulting, as a matter of course, 11 U.S.C. § 362 (1982), in an automatic stay of the creation, perfection, or enforcement of any lien against the property after the date of the filing of the petition. In July 1987, Wheeling–Pitt agreed to sell the Benwood plant to BIPCO Ltd. for $1,350,000. The sale took place on September 14, 1987, under the aegis of the bankruptcy court, and BIPCO was confirmed as the successful purchaser.

Under the agreement of sale, Wheeling–Pitt guaranteed to BIPCO a marketable and insurable fee simple title; hence BIPCO purchased the plant free and clear of claims, liens and encumbrances. Contract of Sale at 2, ¶ 1.02. The bankruptcy court approved the sale, free and clear of liens, and ordered that any liens be paid out of

1. Since the United States guaranteed 90% of the    loan, it is the major party in interest.

the sale proceeds.[2] At the closing, the issue of who was responsible for the unpaid 1985 and 1987 real and personal property taxes arose.[3] Although there was no dispute that BIPCO was not liable for the taxes, the mortgagee bondholders (represented in this action by Equibank and the Farmers' Home Administration) and the debtor-in-possession could not agree whether the taxes were to be paid out of the proceeds of the sale, thereby reducing the mortgagees' receipt of funds, or by the estate as an administrative expense. The sum of $187,618.52, covering the total taxes due as of the date of the closing, was therefore escrowed (out of the sale proceeds) pending determination of the issue.

There is no dispute that the following taxes are due:

| Year | Personal | Real Property |
| --- | --- | --- |
| 1985 | $110,349.71 | $50,938.14 |
| 1987 | $ 12,497.82 | $13,832.85 |

The bankruptcy court held that the taxes must be paid out of the proceeds of the sale, stating that the

> mortgagee is entitled to receive the net proceeds of the sale of the collateral, but it is not entitled to receive an enhancement of the net proceeds of sale by the transfer of debtor's unencumbered assets in payment of prior tax liens on the collateral.

Bankr.Ct.Op. at 7 (Mar. 2, 1988); App. at 48. In sum, the bankruptcy court required the taxes to be paid out of the proceeds of the sale to prevent a windfall to the mortgagees. The court did not distinguish between real and personal property taxes or between perfected liens and unperfected liens.

On appeal, the district court agreed that there was no need to distinguish between those tax claims that had become liens and those that had not become liens. It affirmed the bankruptcy court on the theory that unless the taxes were taken out of the secured creditors' proceeds from the sale,

they would receive a windfall. The district court stated that "the value of the property securing their interests had already been diluted by the tax claims before the sale to BIPCO" and therefore the taxes were the secured creditors' burden. Dist.Ct.Op. at 10 (July 20, 1988); App. at 62. The mortgagees have appealed.

Because only legal issues are presented in this appeal, our review of the district court's decision is plenary. *See Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981).

## II. LEGAL BACKGROUND

### A. The Bankruptcy Code

Both the bankruptcy court and the district court held that the 1985 and 1987 taxes deserve identical treatment. Neither focused its discussion on the provisions governing the creation of liens. We find the issue to be more complicated.

The bankruptcy code permits tax liens to remain attached to secured property as of the date of the petition and entry of the stay. *See* 11 U.S.C. § 362. Where the liens are attached as of the date of the stay, the trustee has the power to sell the property free and clear of the liens by taking the liens out of the proceeds of sale. *See* 11 U.S.C. § 363(b). The code also provides two options for payment of taxes that have not attained lien status as of the date of the entry of the stay. First, they may be payable by the trustee, either as first priority administrative expenses, *see* 11 U.S.C. § 503(b)(1)(B)(i), or as seventh priority expenses, 11 U.S.C. § 507(a)(1). Second, they may be payable by the secured creditor as payment for benefit received, *see* 11 U.S.C. § 506(c).

We must first decide whether the 1985 and 1987 real and personal property taxes were liens at the time of the creation of the automatic stay. Taxes that are not se-

---

**2.** In a supplemental order, the bankruptcy court approved the following paragraph in the agreement of sale:

[T]he liens on such property in favor of any and all of those parties whose liens may be released, shall be shifted to the funds to be derived from the sale and by this Order all such liens shall attach to such proceeds.

Supp. Order at 2–3 (Nov. 6, 1987).

**3.** The 1986 taxes had been paid by Wheeling-Pitt.

cured by liens may be payable as administrative expenses under section 503. Section 503(b)(1)(B)(i) provides that administrative expenses are first priority expenses, payable out of the estate, and include "any tax incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title." 11 U.S.C. § 503(b)(1)(B)(i). Section 507(a)(7) lists those taxes not allowed to be paid as first priority administrative expenses, but rather as seventh priority expenses; among them is "a property tax assessed before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition." 11 U.S.C. § 507(a)(7)(B).

Taxes not secured by liens may also be payable by the secured creditor under section 506. Section 506(c) provides that

> [t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c). Section 506 thus mandates a two-step inquiry: (1) it must be determined whether the taxes are reasonable, necessary costs and expenses of preserving or disposing of the property and (2) whether they benefit the secured creditors. If the taxes are not determined to be the secured creditor's obligation under section 506(c), they would be payable either as first priority administrative expenses pursuant to section 503 or as seventh priority expenses pursuant to 507(a)(7).[4]

### B. The West Virginia Code

The determination whether a property tax has become a lien is determined according to state law. In this case, we look to West Virginia law, because that is the state in which the property is located. Under West Virginia law, real property tax claims become liens as follows:

> There shall be a lien on all real property for the taxes assessed thereon, and

for the interest and other charges upon such taxes, ... which lien shall attach ... each July first ... for the taxes payable for the ensuing fiscal year.

W.Va.Code § 11A–1–2(1987).

There is no West Virginia Code provision that explicitly states when personal property tax liens are created. The sheriff, however, has the power to distrain personal property or to institute a collection suit if taxes are not paid. See W.Va.Code §§ 11A–2–3; 11A–2–2 (1987). See also Don S. Co. v. Roach, 168 W.Va. 605, 606, 285 S.E.2d 491, 492 (1981). As the Supreme Court of Appeals of West Virginia has stated, while "[i]t is true that there is no lien denominated as such on personal property after assessment thereof for taxation [under West Virginia law] ... [i]t is difficult to see any practical difference between [distraint] and a lien." George F. Hazelwood Co. v. Pitsenbarger, 149 W.Va. 485, 487, 141 S.E.2d 314, 317 (1965). We conclude that in the case of personal property governed by West Virginia law, a lien, for purposes of the bankruptcy code, is created at the time that the sheriff distrains the property or receives a judgment lien.

### III. DISCUSSION

#### A. The 1985 Real Property Taxes

Section 362(a)(4) provides that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of.... (4) any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). By its terms, the automatic stay would not affect the secured status of a tax that had already attained lien status, but it prevents the creation of a lien post-petition. Here, the 1985 real property taxes became a lien on the property on July 1, 1984, and the automatic stay went into effect on April 16, 1985. Thus, the 1985 real property tax claims were liens as

---

**4.** The bankruptcy court in *In re Spruill,* 78 B.R. 766, 773 (Bankr. E.D.N.C.1987), framed the issue in the same terms we have, stating that "[i]n some circumstances, it might be appropriate to assess the post-petition taxes to the holder of the

secured claim pursuant to 11 U.S.C. § 506(c)," but where the disposition of the property was not clearly to the benefit of the secured creditor the taxes would be paid as administrative expenses pursuant to § 503.

of the date of the entry of the automatic stay and were thereby unaffected by the stay.

A trustee has the power to sell property in the estate free and clear of existing liens. 11 U.S.C. § 363(f).[5] There is no dispute between the parties that the 1985 real property taxes, which became liens under West Virginia law, *see* W. Va.Code § 11A–1–2, on July 1, 1984, and therefore prior to the entry of the automatic stay on April 16, 1985, are properly payable out of the proceeds of the sale. Thus, we hold that the 1985 real property taxes are payable by the secured creditors out of the proceeds of the sale.

### B. The 1987 Real Property Taxes

Under the West Virginia Code, the 1987 real property taxes would have become liens on July 1, 1986, well after the entry of the automatic stay on April 16, 1985. Thus, the 1987 real property tax claims would not have become liens on the property until after the effective date of the automatic stay and therefore are not liens. 11 U.S.C. § 362. *See In re Carlisle Court, Inc.*, 36 B.R. 209, 214 (Bankr. D.D.C.1983) (automatic stay prevents creation of lien status post-petition).

Wheeling–Pitt argues, however, that taxes are an exception, under §§ 362(b)(3) and 546(b) of the Code, to the automatic stay provision (and hence may become perfected liens even after the filing of a petition in bankruptcy). Section 362(b)(3) provides in pertinent part that the filing of a petition does not operate as a stay "of any act to perfect an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b)." Section 546(b) provides in pertinent part that the rights and powers of a trustee "are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection."

Wheeling–Pitt contends that these provisions were intended to protect an interest-holder's opportunity to perfect that interest if it could have done so had the bankruptcy not intervened.

That result obtained in *In re Yobe Electric, Inc.*, 728 F.2d 207 (3d Cir.1984) (per curiam), but only because the post-petition perfection of the mechanic's lien at issue in that case "relate[d] back," under Pennsylvania law, to the lien's pre-petition creation. *See id.* at 208. In other words, the lien, albeit unperfected, had already been created *before* the bankruptcy. Here, by contrast, West Virginia law had created no lien for the 1987 real estate tax, perfected or otherwise, before the petition was filed.

■■■ We reject Wheeling–Pitt's suggestion that Congress intended to protect "quasi-liens" when it enacted § 546. The legislative history of § 546(b) makes clear that its exceptions to the trustee's awarding power should be narrowly construed. *See In re TM Carlton House Partners, Ltd.*, 91 B.R. 349, 355–56 (Bankr. E.D.Pa. 1988). Those exceptions extend only to cases in which an interest is created prior to bankruptcy and its post-petition perfection relates back, as a matter of law, to the date of its creation. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 86, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5872; H.Rep. No. 595, 95th Cong., 2d Sess. 371, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6327. We see no basis, therefore, for protecting interests arising post petition, such as the tax liens involved here.

Wheeling–Pitt responds that the law creating the tax *lien* post petition merely perfected a preexisting *interest* of West Virginia's in collecting its tax revenue, an interest existing perhaps since the creation of that Commonwealth. In *Maryland National Bank v. Mayor of Baltimore*, 723 F.2d 1138 (4th Cir.1983), the Fourth Circuit seemed to endorse similar reasoning. *See id.* at 1141–44 (characterizing a local

---

**5.** Section 363(f)(3) provides in pertinent part:
   The trustee may sell property ... free and clear of any interest in such property of an entity other than the estate, only if—such in-

terest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property. 11 U.S.C. § 363(f)(3).

government's interest in collecting its property taxes as "long-standing" and "ever-present"). The Second Circuit has just rejected this view, however, *see In re Parr Meadows Racing Association, Inc.*, 880 F.2d 1540 (2d Cir.1989), and we find its reasoning to be far more convincing. The automatic stay provision applies to "all entities," *see* 11 U.S.C. § 362, and the bankruptcy code expressly defines "entities" to include "governmental unit[s]," *see id.* § 101(14). Subjecting local governments to the automatic stay provision reflects Congress's policy choice that "all creditors of a bankrupt estate, including local governments, receive fair and equal treatment." *Parr Meadows*, 880 F.2d at 1547. Thus the section 546(b) exception to the automatic stay provision was "not designed to give the States an opportunity to enact disguised priorities in the form of liens that apply only in bankruptcy cases." S.Rep. No. 989, 95th Cong., 2d Sess. 86, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5872; H.Rep. No. 595, 95th Cong., 2d Sess. 371, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6327. Wheeling–Pitt's view, if adopted, would vitiate these principles.

> Instead of interpreting § 546(b) as a one-time exception for the creditor who gave value but has not yet perfected its lien, [Wheeling–Pitt] would have us create a rotating exception, which, every [year], would add another lien at the front of the priority line, enabling [West Virginia] to effectively collect on all its claims as if no bankruptcy petition had ever been filed. Such an interpretation would effectively remove the taxing arms of [state] government from the controlling provisions of the bankruptcy code, a result clearly contrary to the intent of congress [sic].

*Parr Meadows*, 880 F.2d at 1547. Thus we decline to find any state interest cognizable for purposes of § 546(b) existing as of the date of the bankruptcy filing, and we reject Wheeling–Pitt's argument accordingly.

We are therefore left with the question whether tax claims that have not become liens are payable by the secured creditor as payment for a benefit received, pursuant to section 506, or by the trustee as an administrative expense, pursuant to section 503.

The 1987 real property taxes were not assessed until after the filing of the petition and therefore do not fall into the section 507(a)(7)(B) exception to first priority administrative expenses. They may arguably, therefore, be payable as administrative expenses. *See In re Trowbridge*, 74 B.R. 484, 485 (Bankr. E.D.Pa.1987) (taxes arising post-petition on property of the estate represent administrative expenses of the estate pursuant to § 503(b)(1)(B)(i)).

But they may also arguably be payable as the secured creditor's liability pursuant to section 506(c). It would seem that payment of the taxes was necessary for disposal of the 1987 real property taxes pursuant to the sales contract, which promised a marketable and insurable title. However, it is less clear what benefit the secured creditor derived from payment of those taxes.

■ Neither the bankruptcy court nor the district court addressed the issue in these terms and therefore neither decided whether section 503 or section 506 governed the taxes in this case. More specifically, neither court addressed the arguments advanced here by the parties summarized above at page 82. We generally decline to address issues that have not been passed upon below absent exceptional circumstances (which are not present here). *See Selected Risks Insurance Co. v. Bruno*, 718 F.2d 67, 69 (3d Cir.1983). We are doubly concerned about addressing this issue in this case because in addition to the bankruptcy and district courts, neither party has fully addressed it, aside from Equibank's description of the statutory framework and request for a remand. Moreover, there may well be additional factfinding necessary for resolution of the issues, which can only take place in the district court.

■ Under these circumstances, we will exercise our discretion to remand to the district court for remand to the bankruptcy court for further consideration of the issue. If the court determines that the taxes are

not reasonable, necessary expenses or that there is no direct benefit to the mortgagees, they will be payable out of administrative expenses.

### C. The 1985 and 1987 Personal Property Taxes

■ Neither the bankruptcy court nor the district court distinguished the real property taxes from the personal property taxes. Although West Virginia law provides that real property tax claims become liens at the time they are assessed, *see supra* p. 8, personal property tax claims do not automatically become liens at the time of assessment. The local taxing authorities must obtain relief from the automatic stay to distrain the property or sue the debtor to obtain a judicial lien. *See supra,* p. 9. In this case, no action was taken by the local authorities to create liens in the personal property either by distraint or the filing of a collection suit. Therefore, the 1985 and 1987 personal property taxes are not automatically payable out of the proceeds from the sale as were the 1985 real property taxes which had already attached to the property pre-petition.

The 1985 personal property taxes are classifiable as section 507(a)(7) expenses entitled to seventh priority of payment. Pursuant to section 507(a)(7), taxes assessed before the filing of the petition and payable without penalty after one year before the date of the petition have a seventh priority. 11 U.S.C. § 507(a)(7). Under West Virginia law, they were assessed on July 1, 1984, and were last payable without penalty on October 1, 1985, which is after one year

before the bankruptcy petition was filed. *See* W. Va.Code § 11A-1-3. Like the 1987 real property taxes, they may also be section 506 expenses that benefit the secured creditor and are therefore payable by the secured creditor.

The 1987 personal property taxes are classifiable as first priority administrative expenses. They were assessed on July 1, 1986, not before the filing of the petition, and therefore do not fall into the section 507(a)(7) exception to section 503(b)(1). They are classifiable as administrative expenses unless they serve as a benefit to the secured creditor, in which case the secured creditor should pay the taxes pursuant to section 506(c). The 1987 personal property taxes therefore are payable either by the trustee as first priority administrative expenses pursuant to section 503 or by the secured creditors pursuant to section 506.[6] Because neither court has addressed the personal property issue in these terms, and because there will also be factual development necessary, we will exercise our discretion to remand for further consideration of this issue as well.

### IV. EQUITABLE ESTOPPEL

■ Wheeling–Pitt argues that the secured creditors are equitably estopped from raising the claim that the debtor-in-possession is liable for the taxes because they slept on their rights.[7] The argument goes as follows. The secured creditors were notified that the plant was to be sold and that taxes and other costs would be taken out of the proceeds. *See* App. at 11 (affidavit as to letter of Nov. 25, 1986).

---

**6.** Wheeling–Pitt argues that the district court and bankruptcy court acted properly by deciding the case without addressing the precise statutory provisions that we hold govern, because the courts had the power to exercise their equitable powers pursuant to § 105(a) of the Bankruptcy Code. 11 U.S.C. § 105(a). This issue was not raised below, and neither court asserted that it was exercising its powers under § 105(a). We therefore decline to address it. *See Altman v. Altman,* 653 F.2d 755, 757–58 (3d Cir.1981) (issues not raised in district court will not be considered in court of appeals absent exceptional circumstances). While acknowledging the equitable underpinnings of Wheeling-Pitts's § 363 argument, because we hold

that certain provisions of the bankruptcy code do govern this action, we do not express a holding on whether the mortgagees receive a "windfall" under operation of the code, which was the basis for both the bankruptcy and district court opinions. If the mortgagees receive a windfall through operation of the code, that is an issue to be taken up with Congress.

**7.** The argument that we address at this juncture has been styled "equitable estoppel" by Wheeling–Pitt. Whether that is the correct rubric, or whether the argument should be more properly characterized, for example, as laches, is a matter we need not consider.

Rather than requesting relief from the stay so that they could foreclose on the property, the secured creditors waited until the property was sold before objecting. During the interim, taxes accrued. Furthermore, the fact that taxes were to be paid from the debtor's funds at closing was in the agreement of sale, of which the secured creditors had a copy. Had they objected, the debtor would not have approved the sale and therefore the trustee likely would have abandoned the property and the secured creditors would have been liable for the costs they now wish to avoid. Wheeling–Pitt relies in this regard on *In re Gabel*, 61 B.R. 661, 667 (Bankr. W.D.La.1985), which held that failure to object has the effect of consent when the sale occurs pursuant to Section 363(f). Wheeling–Pitt further argues that the orders of the bankruptcy court dated September 14, 1987 and November 6, 1987 specified that the sale of the Benwood plant was to be free and clear of all liens pursuant to Section 363 and that the proceeds of the sale would be shifted toward satisfaction of any liens on the property.

The secured creditors respond that Wheeling–Pitt's invocation of equitable estoppel principles raises factual issues that are not in the record and which therefore cannot be decided by this court. They note that the November 25, 1986 letter was never introduced into evidence, has not been made part of the record on appeal, and cannot be considered demonstrative of anything.

Second, they point out that, even if the doctrine of equitable estoppel is available as a defense against the United States (the primary secured creditor) at all, an issue the Supreme Court has explicitly left open, *see Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), its application is at least sharply curtailed. As the Tenth Circuit has observed, "courts invoke the doctrine of estoppel against the government with great reluctance." *United States v. Browning*, 630 F.2d 694, 702 (10th Cir.1980), *cert. denied*, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981). The government "may not be estopped on the same terms as any other litigant." *Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224. In order to succeed in asserting equitable estoppel against the United States, a party must at least show "affirmative misconduct" by the government in addition to establishing the traditional elements of estoppel. *See, e.g., United States v. Asmar*, 827 F.2d 907, 911–13 (3d Cir.1987).

Finally, the secured creditors contend that, even if there were an adequate record for this court to consider the issue, Wheeling–Pitt has neither shown nor alleged a factual basis for its contentions that the appellants should be estopped from pursuing this appeal. The secured creditors submit in this regard that they had no reason to object to the transfer of liens to the proceeds, but only to efforts to have a claim that is not a lien paid out of the proceeds. We agree, and find this point dispositive.

> The Agreement of Sale, ¶ 4.07, states: At the time of Closing, there will be no assessments payable ... which are or could become a lien on the Premises except for real and personal property taxes in the approximate amount of $156,-871.87 for the tax year 1985. Seller shall request authority from the United States Bankruptcy Court for the Western District of Pennsylvania to have those taxes paid from Seller's funds at the Closing . . . .

Even if this language presupposes that the 1985 taxes were liens, it says absolutely nothing about who was expected to pay for the 1987 taxes, which were not liens. However, we need not wrestle with this language, because on November 6, 1987, before the final closing, the bankruptcy court issued a supplemental order pertaining to the "attachment of claims, liens and encumbrances to the proceeds of sale." The bankruptcy court's order reads as follows:

> [T]he *liens* on such property in favor of any and all of those parties whose liens may be released, shall be shifted to the funds to be derived from the sale and by this Order all such liens shall attach to such proceeds.

Supp. Order at 1–2 (Nov. 6, 1987) (emphasis added). Based on this order, the secured creditors had reason to assume that the only taxes to be taken out of the sale proceeds would be those secured by liens.

Thus, Wheeling–Pitt is clearly wrong in its assertion that the mortgagees were resting on their rights and are now trying to "slip through the back door." *See* Appellee's Br. at 27. Any letter that was sent by the debtor on November 25, 1986, must be trumped by this November 6, 1987 order. Wheeling–Pitt argues that the secured creditors should have raised the issue prior to the closing. But that is incorrect—the mortgagees raised it at the closing and they had no reason prior to the closing to question it. And if Wheeling–Pitt could establish the usual elements of equitable estoppel—and the facts here do not meet the rigorous showing normally required—it has not made even a colorable showing of affirmative misconduct as is necessary to establish an equitable estoppel against the government. In sum, Wheeling–Pitt's equitable estoppel claim is clearly without merit, and we see no need to remand for findings or other proceedings on this point under the circumstances.

## V. CONCLUSION

We will affirm the district court's order that the 1985 real property taxes are payable out of the sale proceeds. We will vacate the district court's order that the 1987 real property and 1985 and 1987 personal property taxes be paid out of the sale proceeds and remand the case to the district court to remand to the bankruptcy court for further proceedings consistent with this opinion.