In re MALL AT ONE ASSOCIATES, L.P., Debtor.

Bankruptcy No. 93–15504 DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 31, 1995.

Lawrence J. Tabas, Philadelphia, PA, for debtor.

Douglas Candeub, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for Mall at One Group, L.P.

Joseph DiGiuseppe, Philadelphia, PA, for City of Philadelphia.

Stewart Paley, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Bank of New York—Nat. Community Div.

Lawrence G. McMichael, Dilworth, Paxson, Kalis & Kauffman, Philadelphia, PA, for First American Title Ins. Co.

Ivan J. Krouk, Lincoln Rittenhouse, Philadelphia, PA, for RK Mall Corp., general partner of the debtor.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

In the instant dispute, we are confronted with several issues arising in context to objections to proofs of tax claims ("the Objections") filed by the City of Philadelphia ("the City"). As to the issues to which the parties have directed the most attention, we will sustain the objection to all taxes which arose prior to the Debtor's purchase of the real property owned by it at the commencement of the underlying bankruptcy case, a shopping mall located at Roosevelt Boulevard and Grant Avenue in Philadelphia ("the Mall"). We believe that this resolution is appropriate because the City can effectively assert these claims against the purchaser of the Mall at an auction sale conducted in conformity with the Debtor's confirmed plan, especially since this party was also the prior owner of the Mall who was liable for the taxes arising prior to the Debtor's ownership of the Mall, and because the issues raised are unresolved state law issues in which the City has a strong interest, thus justifying our abstention.

We also hold that the City's real estate tax claims and its pre-petition business use and occupancy 1993 tax ("BU & O") claims are properly classified as seventh priority, rather than secured claims. As such, we hold that the Debtor's confirmed plan allows the City to receive most of the compensatory interest which it seeks, but not penalties which are collectible in addition to interest. Further, we find that the City post-petition 1994 real estate tax claims and its post-petition BU & O tax claims are properly classifiable as administrative claims as to which the Debtor's confirmed plan does not preclude the City from receiving all penalties as well as interest.

Finally, we honor the City's request not to classify the 1995 real estate taxes, and designate them as simply nondischargeable post-confirmation obligations also collectible from the Mall's purchaser.

### B. FACTUAL AND PROCEDURAL HISTORY

MALL AT ONE ASSOCIATES, L.P. ("the Debtor") filed the underlying voluntary Chapter 11 bankruptcy case on September 24, 1993. As we explained in a prior to-be-published Opinion, now reported only at 185 B.R. 981 (Bankr.E.D.Pa.1995) ("*Opinion II*"), in which we mostly denied the Debtor's motion to recover attorney's fees and expenses from its primary secured creditors pursuant to 11 U.S.C. § 506(c), the Debtor's only business has been ownership and operation of the Mall. 185 B.R. at 984.

As is noted in *Opinion II*, at *id.*, the Debtor had four principal creditors at the outset of the case: (1) the Bank of New York—National Community Division, the

first mortgagee of the Mall ("BNY"), which held a fully secured claim of $4.3 million; (2) Mall at One Group, L.P. ("Group"), the second mortgagee of the Mall, holding a claim of approximately $5.5 million which, in light of he $7.0 million value of the Mall, is undersecured; (3) ING Vastgoed One B.V., a third mortgagee whose $3.8 million claim was entirely unsecured; and (4) the City, which asserted secured, priority, and administrative tax claims totalling over $500,000.

After several failed attempts at presenting a confirmable plan, the Debtor succeeded in achieving confirmation of its Fifth Amended Plan of Reorganization Pursuant to Chapter 11 of the United States Code ("the Plan") on January 17, 1995. The Plan contemplated a sale of the Mall to a private entity, New Plan Realty Trust ("New Plan"), for a price of not less than $7 million, and provided for an auction sale of the Mall in the event that the sale to New Plan did not occur. Unfortunately, the sale to New Plan fell through, to the disappointment of all interested parties. As a result, the anticipated smooth consummation of the Plan did not occur. Instead, the auction alternative was triggered, which ultimately resulted in a successful credit bid of $7 million for the Mall by Group at the auction of April 11, 1995. As was exemplified by a dispute regarding the bid process resolved in Group's favor in a previous decision reported at 1995 WL 318851 (Bankr. E.D.Pa. May 23, 1995) ("*Opinion I*"), and as was noted in *Opinion II*, 185 B.R. at 984–985, these unexpected developments have led to considerable rancor and litigation among the parties. This is not surprising, because the Plan provisions are being applied to scenarios not envisioned by the parties at the time of confirmation.

The City filed two claims which are the subject of the Objections. The first (Claim No. 2), filed December 17, 1993, covered real estate taxes for tax years 1988, 1989, and 1993, and asserted a $288,048.06 totally-secured claim. The second (Claim No. 3), filed January 10, 1994, recited a $730.30 secured claim for unpaid water and sewer charges billed in June 1990,[1] and a $92,024.33 priority claim for BU & O taxes arising in various months between May 1988 and September 1993.

The Plan, drafted and confirmed in happier days when the New Plan sale was contemplated, treated the City's BU & O tax claims in Class 2 and its real estate tax claims in Class 3. The Plan provides for treatment of Class 2 claims as follows:

> The Debtor expects to reach an agreement with the City as to Debtor's liability for business, use and occupancy taxes.... All Class 2 Allowed Claims shall be paid in full in Cash on the Effective Date or as soon as practicable thereafter, unless a holder of such Claim agrees to less favorable treatment. A total of 730.30 is claimed due by the City for water and sewer service and $92,754.63 was originally claimed due by the City for BU & O Taxes. The Debtor does not believe it is liable for BU & O Taxes in excess of $3,317.04. Such Claim for BU & O Taxes is therefore a Contested Claim. As part of the settlement discussed in Section 3.3 below [addressing the Class 3 claims], the Debtor expects the City to agree with the Debtor's position with respect to BU & O Taxes.

Class 3 claims, meanwhile, are treated as follows:

> The 1993 (together with interest thereon through August 15, 1994) real estate taxes will be paid in full in Cash on the Effective Date. Although the Debtor does not believe it is liable for the 1988 and 1989 real estate taxes, and as the Debtor further believes that the taxes assessed by the City for 1988 and 1989 are excessive, such Claim is therefore a Contested Claim. In order to remove the lien of the 1988 and 1989 real estate taxes from the Property (a condition to its sale to the Property Purchaser or to any purchaser pursuant to an auction sale) without the delay and expense of litigation, the Debtor will agree to

---

**1.** The water and sewer liability was, as far as we can tell, never mentioned in the hearings and briefs. The City did not include this claim among the amounts recited in its reply brief despite the request for any such designation in our Order of August 8, 1995. *See* page 1013 *infra.* We therefore assume that these charges have either been paid or the City has for some other reason abandoned them.

pay the 1988 and 1989 real estate taxes (together with interest thereon through August 15, 1994) in full in Cash on the Effective Date, provided that the City (i) agrees to accept $10,000 in respect to its Class 1 [administrative] Claim for payment of post-petition real estate taxes as an administrative expense, (ii) agrees that the Debtor's liability for BU & O Taxes is limited to $3,317.04 and (iii) fully releases Group and the Property Purchaser or any purchaser through an auction from any liability arising in connection with the Property at any time until the Confirmation Date, for any pre-petition or post-petition real estate taxes, BU & O Taxes or other taxes related to the Property.

The global settlement between the Debtor and the City anticipated as to much of the tax liability in issue was unfortunately never consummated. Therefore, the terms set forth in the last sentence of the immediately preceding Plan section never became effective.

On April 7, 1994, just prior to the auction sale, Group filed the Objections in issue. The Objections disputed numerous aspects of the City's claims, including the allegedly improper retroactive revocation of tax abatements previously granted to Group, as the prior owner of the Mall, for tax years including 1988 and 1989; the claim of secured status; the inclusion of penalties; and most of the liability for BU & O taxes. The Objections were originally scheduled for a hearing on May 24, 1995, but the hearing was continued several times to attempt to finalize a proposed settlement. Finally, on June 28, 1995, we ordered that a further request for a continuance until July 19, 1995, would be the last allowed. BNY, the Debtor, and First American Title Insurance Co. ("1st American"), which insured the Mall's title in the purchase by the Debtor, as unencumbered, joined the Objections on April 11, 1995; June 21, 1995; and June 27, 1995, respectively.

No settlement was reached and the hearing was in fact conducted on July 19, 1995. At the outset, we sustained the City's Objection to 1st American's participation in the hearing due to its lack of standing as a non-creditor. The bulk of the testimony focused on the validity of the City's attempted revocation of the tax abatement previously granted to Group, resulting in 1988 and 1989 real estate tax claims totalling about $160,000. Called by the Objectors were Arthur M. Halvajian, Group's former managing partner; Charles Morrison, a City employee who was formerly its "abatement coordinator;" Ivan Krouk, an attorney who is a shareholder of the Debtor's general partner, RK Mall Corp.; William J. Taylor, an agent of 1st American; and Michael Weinstein, a partner in the firm of the Debtor's counsel, who presented his expert opinion as to why the tax abatement could not have been legally rescinded. The City called three of its employees, Joseph N. Williams, who testified at some length about tax abatements; Karen Arthur, who spoke to the BU & O claims; and Kevin O'Donnell, who briefly testified concerning the 1993–95 real estate taxes.

At the close of the hearing, the interested parties were given until August 4, 1995, to file opening briefs, and until August 11, 1995, to file reply briefs. Having reviewed the parties' opening briefs and having concluded that the parties' positions were unclear on the crucial subject of their respective bottom lines, we entered an Order of August 8, 1995, requesting the parties to each clearly disclose what they believed to be the correct amounts and classifications of all of the tax claims in issue. Group, the Debtor, and the City all proffered two timely submissions.

The testimony established certain history of the ownership of the Mall relevant to the issues in question. The Mall was originally built and owned by Group. Group applied to the City for an exemption from its real estate taxes on its improvements to the commercial or business property in issue on December 28, 1983, after the Mall's completion. This application was approved on May 28, 1985, and Group was granted a fifty (50%) percent tax abatement, to be effective from January 1, 1985, through December 31, 1989. When Group allegedly failed to keep current with all of its City taxes in 1988 and 1989, which the City claimed was a condition of the abatement, the City proceeded to revoke the abatement for 1988 and 1989 by a letter dated January 16, 1990. Halvajian claimed

to not have received the letter, which contained an error in its address, and thus to have been unaware of the City's actions as of the date that Group settled with the Debtor, April 13, 1990. It is an understatement to observe that the City's actions in resolving the abatement were disputed. The parties disagreed over the City's authority in reimposing taxes for the years for which the City had earlier granted an abatement for numerous reasons, including a challenge to the constitutionality of the City's actions.

As we indicated at page 1012 *supra* and is described in more detail in *Opinion II, supra*, 185 B.R. at 985–986, Group was the successful bidder for the Mall at the post-confirmation auction held on April 11, 1995, for a bid price of $7 million.

## C. DISCUSSION

1. *THE CITY'S CLAIMS ARE NOT BARRED BY 11 U.S.C. § 502(b)(3) BECAUSE THE MALL HAS VALUE WHICH EXCEEDS THE CITY'S CLAIMS AND BECAUSE SOME OF THE OBLIGATIONS IN ISSUE ARE POST–PETITION ADMINISTRATIVE OBLIGATIONS WHICH ARE NOT TECHNICALLY "CLAIMS."*

■ In an effort to deliver a haymaker to all of the City's claims in issue, the Debtor (but not Group) references 11 U.S.C. § 502(b)(3), which provides as follows, in support of the Objections:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount except to the extent that—

. . . . .

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property.

The Debtor argues, with simple logic, that the Debtor's equity in the property against

which the City's taxes are assessed, *i.e.*, the Mall, is zero. Therefore, it contends, all of the City's tax claims necessarily exceed the value of the interest of the Debtor's estate in the Mall and these claims are all barred by § 502(b)(3).

In a lengthy description of the history and purpose behind § 502(b)(3), 3 COLLIER ON BANKRUPTCY, ¶ 502.02[4], at 502–48 (15th ed. 1994) ("Collier"), states that

[i]t is designed to prevent depletion of the debtor's estate by the payment of overdue taxes on property which has come into the hands of the trustee despite the fact that such property had no value to the estate and was more frequently than not abandoned to mortgagees, other lienors, or to taxing authorities. The injustice of such payments at the expense of the general unsecured creditors for the benefit of mortgagees or other lienors is clear since the payment of taxes from the estate of the debtor would clear away tax claims which might otherwise have remained charges on the property.

The facts of the cases cited by the Debtor in support of the application of § 502(b)(3) are drastically different from the instant case, *e.g.*, *In re Spruill*, 78 B.R. 766, 767–68 (Bankr.E.D.N.C.1987) (tax claims against property foreclosed prior to the bankruptcy case); and *In re Skinner Lumber Co.*, 35 B.R. 31, 31–32 (Bankr.D.S.C.1983) (tax claims against property abandoned by the trustee).

Later in the text quoted above, Collier limits the application of § 502(b)(3) by stating, 3 COLLIER, *supra*, ¶ 502.02[4], at 502–48, that "[i]t should be borne in mind that section 502(b)(3) deals with unsecured claims." Finally, it should be noted that the term "claim," as utilized in § 502 generally, references pre-petition obligations. *See, e.g., In re Central R.R. of N.J.*, 950 F.2d 887, 890–92 (3d Cir.1991); *In re M. Frenville Co.*, 744 F.2d 332, 337 (3d Cir.1984), *cert. denied sub nom. M. Frenville Co. v. Avellino & Bienes*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); and *In re Farley*, 135 B.R. 493, 495–96 (Bankr.E.D.Pa.1992) (all assuming, by implication, that a "claim" must arise pre-petition).

■ Before applying the foregoing considerations to the Debtor's efforts to invoke § 502(b)(3) here, several observations are pertinent. First, the Objections in issue, filed by Group but merely joined by the Debtor, do not raise § 502(b)(3) as a basis for the relief sought. Nor was the application of § 502(b)(3) raised as an issue during the lengthy hearing. Instead, the arguments based on this Code section appeared for the first time in the Debtor's post-trial brief. While generally Objections to proofs of claim need not be pleaded with great precision, we would be most reluctant to sustain a substantive objection to a proof of claim raised for the first time in briefing, since the claimant, which bears the ultimate burden of proof on the issue of the validity of its claim, *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992), would not be placed on notice of what issues it must prove to sustain its claim.

Secondly, we note that Group does not cite § 502(b)(3) in support of its Objections, either in its opening brief nor in its reply brief filed after the Debtor argued the application of this Code section. Finally, the Debtor is less than positive in its own arguments referencing § 502(b)(3). In its initial statement in the text of its brief, it states that the taxes at issue "*may* not be allowable" on the basis of this section (emphasis added), and then proceeds to argue this point for only two pages before turning to other arguments.

Applying the considerations referenced in the penultimate paragraph to the facts at hand causes us to reject the application of § 502(b)(3) on its merits. That Code section has been applied only to taxes on incidental property transferred, abandoned, or foreclosed upon prior to bankruptcy. By way of contrast, the Mall is, for all practical purposes, the Debtor's sole asset.

Further, the Mall is not without value to the Debtor's estate. It is property worth about $7 million. The estate's interest in the Mall led to the filing of this case and confirmation of the Plan. Lack of equity is not the equivalent of valuelessness. The Mall has a value to the estate well in excess of the City's claims of about $500,000.

Moreover, as the City points out in its reply brief, its claim does not benefit secured creditors at the expense of unsecured creditors, who Collier indicates are the targeted beneficiaries of § 502(b)(3). If the City's claims were denied, secured creditors, mainly Group and perhaps BNY, would feed upon what would otherwise be the City's slice of the pie.

■ The City argues that its claims are secured, while § 502(b)(3) deals only with unsecured tax claims. We ultimately conclude, at pages 1018–1019 *infra*, that none of the City's claims arising from real estate tax delinquencies are in fact secured. However, any of the real estate tax claims, and particularly the 1995 real estate taxes, are subject to being liened in the future, especially since, through the auction sale, transfer of equitable title to the Mall has or will pass to Group. Furthermore, many of the claims in issue were incurred post-petition and are therefore not within the general scope of the term "claim." These post-petition obligations are found by us to be merely administrative "claims," not within the scope of the term "claim" as we believe it is used in § 502(b)(3). Therefore, much of the taxes in issue could not possibly be found to be within the scope of § 502(b)(3).

For all of these reasons, we determine the Debtor's invocation of § 502(b)(3) to be off the mark and not useful in attacking the City's claims.

2. *ALL OF THE 1988 AND 1989 TAXES, PRE–DATING THE DEBTOR'S PURCHASE OF THE MALL AND BEING UNLIENED, ARE NEITHER PROPERLY CLAIMED AGAINST THE DEBTOR NOR DISCHARGEABLE, BUT RATHER, AS PROPER FARE FOR ABSTENTION IN ANY EVENT, SHOULD BE RESOLVED BETWEEN GROUP AND THE CITY IN ANOTHER FORUM.*

■ More convincing are the Debtor's arguments, again not joined by Group because of Group's obvious awareness that the City's claims will be deflected to it if they are sustained as to the Debtor on this basis, that the City's 1988 and 1989 tax claims against

the Mall property, arising from tax years prior to the Debtor's purchase of the Mall, cannot be asserted against the Debtor, but could be asserted against Group. The Debtor correctly argues that personal liability for real estate taxes, while an incident to ownership of land, does not arise when a party is out of ownership. *See, e.g., Northumberland County v. Philadelphia & Reading Coal & Iron Co.,* 131 F.2d 562, 565–67 (3d Cir.1942); *Stephens v. Reed,* 121 F.2d 696, 698 (3d Cir.1941); *Pennsylvania Co. for Insurances on Lives & Granting Annuities v. Bergson,* 307 Pa. 44, 49–50, 159 A. 32, 34 (1932); and *Theobold v. Sylvestor,* 27 Pa.Super. 362, 364 (1905).

■ This state of affairs rarely proves troublesome to taxing authorities in collecting their due, because delinquent taxes, particularly real estate taxes, can be liened. It is quite clear that such tax liens run with the land and can be collected by foreclosing those liens to the detriment of whoever happens to be in title. *See, e.g., Steen's Estate,* 175 Pa. 299, 301–02, 34 A. 732, 733 (1896); *Brundred v. Egbert,* 158 Pa. 552, 558, 28 A. 142, 143 (1893); and 36 P.L.E. 261 (1961).

O'Donnell testified that the 1988 and 1989 taxes were first liened in October 1990, after the Debtor acquired title to the Mall. If the Debtor were still the equitable owner of the Mall, or if it had a duty to an innocent transferee at the auction sale to satisfy all outstanding liens against the Mall, the incidence of personal liability for the taxes would not be of great significance. The Debtor would probably still be liable for these taxes in those events. However, the owner of the Mall in 1988 and 1989, and therefore the party personally liable for any taxes due for these tax years, was Group. Fortuitously for the City and the Debtor alike, Group was the successful purchaser at the auction sale. It is difficult to understand how any duty could fall upon the Debtor to clear off tax liens arising prior to its ownership as to Group, when Group itself is personally liable for these taxes and had earlier passed the title of the Mall to the Debtor with such claims arguably attached. Certainly, Group is not an innocent purchaser of the Mall which, for that reason, could take title to the Mall free and clear of the City's 1988–89 tax claims.

The bottom line of the foregoing is that, whatever tax liability exists for any 1988 or 1989 real estate taxes due on the Mall, it should fall on Group, not the Debtor. As a result, the question of liability for these taxes raises issues which should and can be resolved between Group and the City alone.

■ We disagree with the City's suggestion that this court lacks jurisdiction to decide the issues raised in the Objections because these issues were not previously raised before appropriate administrative appellate tax bodies. Subject to its discretion to abstain, this bankruptcy court, by reason of 11 U.S.C. § 505, has been accorded the power to decide tax disputes, irrespective of whether the Debtor exhausted any available administrative remedies. *See In re AWB Associates,* 144 B.R. 270, 275–78 (Bankr.E.D.Pa. 1992).

■ However, in *AWB, supra, id.* at 276, this court, citing *In re Galvano,* 116 B.R. 367, 372 (Bankr.E.D.N.Y.1990), thusly recited the factors which a bankruptcy could should consider in deciding whether to in fact proceed to determine a particular tax dispute:

(1) the complexity of the tax issue to be decided; (2) the need to administer the bankruptcy case in an orderly and efficient manner; (3) the burden on the bankruptcy court's docket; (4) the length of time required for trial and decision; (5) the asset and liability structure of debtors; and (6) any prejudice or potential prejudice to both the debtor and taxing authority.

■ Apart from the context of when it should exercise its § 505 powers, a bankruptcy court should generally refrain from deciding any issues which constitute disputes between creditors which will have little, if any, effect on the administration of the debtor's case. *See In re Selig,* 135 B.R. 241, 243–45 (Bankr.E.D.Pa.1992); and *In re City Wide Press, Inc.,* 107 B.R. 68, 70–72 (Bankr. E.D.Pa.1989). The lack of a need to decide an issue involving taxes to administer a debtor's estate is one of the factors to be considered in deciding whether to exercise jurisdiction under § 505. *See AWB, supra,* 144 B.R.

at 276. We find that the dispute about the 1988–89 taxes is, in essence, a dispute between Group and the City which they can and should litigate elsewhere.

Other considerations point to resolution of the 1988–89 real estate tax dispute between Group and the City in another forum. The issues presented in determining whether the tax abatement on the Mall was justifiably rescinded are difficult and complex issues. In light of the absence of citation to authority directly on point by any interested parties, these issues also appear to constitute issues concerning which the outcome is uncertain, and which are of great potential importance to the fragile tax base of the City. Such considerations counsel not only against the exercise of § 505–like powers, *see AWB, supra,* 144 B.R. at 276, but also support exercising discretionary abstention against deciding these issues generally. *See In re Stephen Smith Home for the Aged, Inc.,* 80 B.R. 678, 680–87 (E.D.Pa.1987); and *In re West Coast Video Enterprises, Inc.,* 145 B.R. 484, 488 (Bankr.E.D.Pa.1992). *Cf. In re Cloverly Associates, L.P.,* 1993 WL 63460 (Bankr. E.D.Pa. March 3, 1993) (court *sua sponte* abstains from deciding an issue of local land use, even though that issue definitely did involve the debtor).

The issue of the Debtor's liability for the 1988–89 BU & O taxes is fraught with similar considerations. In her testimony, City witness Arthur stated that "[t]he new owner is not obligated to pay the prior owner's responsibilities" for BU & O taxes. Therefore, again, Group appears to be the proper target for the City's collection efforts, as the "prior owner" during accrual of the 1988–89 BU & O taxes, not the Debtor. While this issue of liability for 1988–89 BU & O taxes may not be as complex as the question of liability for the 1988–89 real estate taxes, it is equally insignificant to the administration of the Debtor's case. The determination of this issue, too, should therefore be left for Group and the City to thrash out between themselves in another forum. Therefore, with the

caveat that this court is in no sense discharging Group from liability for same, we will proceed to sustain the Objections to each of the 1988–89 tax liabilities asserted by the City against to the Debtor.[2]

3. *THE REMAINING PRE–PETITION CLAIMS OF THIS CITY ARE PROPERLY CLASSIFIED AS UNSECURED PRIORITY CLAIMS; MOST OF THE POST–PETITION CLAIMS ARE PROPERLY CLASSIFIED AS ADMINISTRATIVE CLAIMS; BUT THE CITY IS ENTITLED TO HAVE THE 1995 REAL ESTATE TAXES TREATED AS A NONDISCHARGEABLE, POST–PETITION AND POST–CONFIRMATION EXPENSE.*

The City initially claims that, in light of O'Donnell's testimony that it "liened" the 1993 and 1994 real estate taxes in February 1994, and February 1995, respectively, both the 1993 and 1994 real estate tax claims are properly classified as secured claims. The Debtor and Group both argue that, since the City did not obtain relief from the automatic stay prior to entry of the liens, the liens are void and the tax claims for both years in issue are unsecured priority claims. We find that this position of the objecting parties is, for the most part, correct.

The first issue to be determined is when the Debtor's obligations to pay the real estate taxes in issue were incurred. The time when a tax is incurred is established by the law of the governmental taxing authority in issue. *See In re Columbia Gas Transmission Corp.,* 37 F.3d 982, 984 (3d Cir.1994), *cert. denied sub nom. West Virginia State Dep't of Tax v. Internal Revenue Service,* — U.S. ——, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995); and *Equibank, N.A. v. Wheeling–Pittsburgh Steel Corp.,* 884 F.2d 80, 84 (3d Cir.1989). As argued by the City, the pertinent local ordinance, PHILADELPHIA, PA., CODE ("CODE"), § 19–1303(2), provides

---

**2.** This resolution eliminates our need to evaluate most of the hearing testimony presented by Group or to decide the several issues argued in the parties' briefs relative to the 1988–89 real estate tax liability, including the propriety of

Weinstein's testimony and all of the issues raised by Weinstein in his testimony, as well as the constitutionality of the City's procedures in terminating these tax abatements and such abatements generally.

that real estate taxes for a particular tax year are first assessed and payable, without discounts, in March of the year for which the tax is due. Therefore, it appears logical to conclude that the annual real estate taxes for a particular year are incurred on March 31 of that year. Group, in its submissions, also accepts the March 31 date as the date on which real estate taxes are incurred. The Debtor appears to argue that taxes are incurred in January; however, since it fails to recite any authority to do so, we will accept the March date proposed by the other parties.

The 1993 real estate taxes therefore were incurred pre-petition, on March 31, 1993. The 1994 real estate taxes were incurred on March 31, 1994, during the course of the Debtor's bankruptcy. The 1995 real estate taxes, becoming due on March 31, 1995, were incurred post-confirmation.

■ Although the City purports to have secured the 1993 real estate by filing a lien for these taxes in February 1994, it is clear that the automatic stay provision of the Bankruptcy Code prevents perfection of a lien post-petition, while the stay is still in effect. Specifically, 11 U.S.C. § 362(a)(4) provides that a bankruptcy filing "operates as an automatic stay applicable to all entities, of— ... (4) any act to create, perfect, or enforce any lien against the property of the estate; ..."

■ It is well established that the entry of a tax lien securing a post-petition tax liability, as well as the post-petition entry of a lien securing a pre-petition tax liability, violates the automatic stay. *See In re C.S. Associates,* 29 F.3d 903, 905 (3d Cir.1994); *Makoroff v. City of Lockport,* 916 F.2d 890 (3d Cir.1990), *cert. denied,* 499 U.S. 983, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991); *Equibank, supra,* 884 F.2d at 83–85; *In re Building Technologies Corp.,* 167 B.R. 853, 857 (Bankr.S.D.Ohio 1994) (automatic stay prevents acquisition of a valid lien, post-petition, by a taxing authority); *In re Eastern Steel*

*Barrel Corp.,* 164 B.R. 477, 479 (Bankr. D.N.J.1994); *In re Erie Hilton Joint Venture,* 125 B.R. 140, 147 (Bankr.W.D.Pa.1991) (Section 362 prevents the creation of a lien for post-petition real estate taxes while the automatic stay is in effect); and *In re Trowbridge,* 74 B.R. 484, 485 (Bankr.E.D.Pa.1987) (Section 362(a) prevents taxing authorities from asserting liens for post-petition taxes).

■ The 1993 real estate taxes therefore cannot be classified as secured claims. Post-petition real estate tax claims which have not attained lien status, such as these claims, may be allowed either as an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(B)(i) and receive first priority through 11 U.S.C. § 507(a)(1), or receive seventh priority under § 507(a)(7)(B).[3]

The City would appear to be on sounder ground with respect to its claim that the indebtedness for the 1994 real estate taxes is secured. The confirmation of the Debtor's Plan on January 17, 1995, would ordinarily terminate the automatic stay as of that date. *See* 11 U.S.C. §§ 1141(b), (d)(3), 362(c)(2)(C). However, the Debtor's confirmed Plan expressly provides that, "[p]ending the closing of the case ..., the stay imposed by the presence of Section 362 of the Bankruptcy Code shall remain in effect." Therefore, as of the date that the City purported to record its lien for the 1994 real estate taxes in February 1995, the automatic stay remained in effect and the lien entered by the City against the Debtor with respect to the 1994 taxes was void. Hence, the claims of the City based upon 1994 real estate taxes, like those based upon the 1993 real estate taxes, cannot be classified as secured, although they may be classified as either administrative or seventh priority claims under § 507(a)(7)(B).

Since the 1993 real estate taxes were incurred pre-petition, there is little question that they are properly classified as seventh priority claims, pursuant to § 507(a)(7)(B). The proper classification of the 1994 real estate taxes is less obvious.

---

**3.** The addition of a new 11 U.S.C. § 507(a)(7), creating a priority for support and alimony obligations, in the Bankruptcy Reform Act of 1994 ("the BRA") caused the previous § 507(a)(7) to be renumbered as § 507(a)(8). Since the filing of this case preceded the enactment of the BRA, the pre-BRA version of the Code remains in effect and thus we cite the present § 507(a)(8) as § 507(a)(7) herein.

■ At first blush, it seems very improbable that obligations which, like the 1994 real estate taxes, were incurred post-petition could, on any basis, be classified together with pre-petition claims. In fact, the position of not only the City but also Group is that they *are* administrative claims. However, the Debtor contends that the 1994 real estate taxes are in fact seventh priority claims under § 507(a)(7)(B) as well, basing its argument upon application of 11 U.S.C. § 502(i), which provides as follows:

A claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(7) of this title shall be determined and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

The Debtor argues, with a simplicity reminiscent of its arguments based on § 502(b)(3), *see* page 1014 *supra*, that the 1994 real estate taxes, although arising after the commencement of this case, are entitled to a § 507(a)(7) priority, and therefore should be treated the same as if this claim had arisen pre-petition. The Debtor contends that several courts have agreed with this reading of § 502(i) and have accordingly refused to recognize tax claims arising post-petition as administrative expenses, *e.g., Trowbridge, supra,* 74 B.R. at 486 n. 2; *In re Kamstra,* 51 B.R. 826 (Bankr.W.D.Mich. 1985); *In re Carlisle Court, Inc.,* 36 B.R. 209, 217–18 (Bankr.D.D.C.1983); and *In re New England Carpet Co.,* 26 B.R. 934, 937–38 (Bankr.D.Vt.1983).

None of these authorities support the proposition that § 502(i) converts what would otherwise be a post-petition, administrative, first-priority tax claim into a seventh-priority claim. In *Trowbridge,* Judge Fox, we think accurately, notes that "[s]ome courts [citing *Carlisle Court* ] have held that postpetition taxes which are *not* administrative expenses, but which are of a kind described by § 507(a)(7), are prepetition priority claims by virtue of § 502(i)." 74 B.R. at 486 n. 2 (emphasis added). *Carlisle Court* holds to the contrary of the Debtor's proposition.

The taxes in issue there were found to be entitled to administrative priority and therefore *not* within the scope of § 502(i). 36 B.R. at 214–18. In *Kamstra,* the court considered taxes assessed and last payable without penalty pre-petition which were not classifiable as administrative claims. 51 B.R. at 833. *New England Carpet* also involved taxes assessed pre-petition. 26 B.R. at 940.

We previously concluded that the 1994 real estate taxes were incurred post-petition. *See* page 1018 *supra.* These taxes are therefore post-petition taxes which are not, in the language of § 502(i), "entitled to priority under section 507(a)(7)." Therefore, § 502(i) does not apply to these taxes. *See In re Gould & Eberhardt Gear Machinery Corp.,* 69 B.R. 944, 946 (Bankr.D.Mass.), *rev'd on other grounds,* 80 B.R. 614 (D.Mass.1987) (§ 502(i) applies only to situations where events giving rise to a tax occur pre-petition, but the dollars taxed are received post-petition, disagreeing with *New England Carpet* that merely the pre-petition date of assessment triggers § 502(i)), and other cases cited therein.

The logical intention of the Debtor's argument would be that all taxes classifiable under § 507(a)(7), if pre-petition, including all real estate taxes within the scope of § 507(a)(7)(B), could never be classified as administrative claims. This is clearly not the case, since § 503(b)(1)(B) expressly provides that any tax incurred by the estate, except the type specified in § 507(a)(7), is to be treated as an administrative expense. *See Equibank, supra,* 884 F.2d at 86; *Erie Hilton, supra,* 125 B.R. at 148; *Trowbridge, supra,* 74 B.R. at 485; and 3 COLLIER, *supra,* ¶ 503.04, at 503–36. As to the reference to § 507(a)(8) in § 503(b)(1)(B)(i), quoted at page 1022 *infra,* Collier explains that "the reference in section 503(a)[b](1)(B)(i) to section 507(a)(8) means [only] that to the extent a debtor's pre-petition liability becomes a tax claim after the petition, it is not for that reason alone to be given administrative expense status." 3 COLLIER, *supra,* ¶ 503.04, at 503–39.

Thus, as in the case of the Debtor's invocation of § 503(b)(3), we conclude that the Debtor's attempt to broaden the application

of § 502(i) to apply to all of the City's tax claims must fail. We therefore conclude that the 1994 real estate tax liabilities in issue are properly classified as an administrative "claims" entitled to first priority.

The 1995 real estate tax liability is not only a post-petition "claim," it is a post-discharge "claim." While the City might have available the option of asserting this obligation as an administrative claim, it has expressed a desire to forego this option and to have the 1995 real estate tax claim "treated" as a nondischargeable post-confirmation indebtedness. We believe that this is an option which is open to the City.

The City may enter a lien for the 1995 taxes, or any of the taxes for prior years, after obtaining relief from the automatic stay. However, obtaining relief at this juncture to enter such a lien, particularly as to the 1995 taxes, may not be difficult, as in the case of BNY's readily obtaining relief to proceed with its state court remedies against the Debtor in an Order of this court of July 19, 1995. If and when it does so, any lien subsequently entered would become a lien against the Mall in the hands of Group, presently the equitable owner and soon to become the legal owner of the Mall. The amount of principal, interest, and penalties for the 1995 taxes therefore will dissolve into a dispute between the City and Group, similar to the controversy concerning the 1988 and 1989 taxes.

Perhaps because the amounts involved are less than those of the real estate taxes, the parties devote considerably less attention to the resolution of the status and amount of the BU & O taxes than to the status and amount of the real estate taxes in issue. We already concluded, at page 1017 *supra*, noting also the concurrence of the City's own witness Arthur, that the 1988 and 1989 BU & O taxes, like the other taxes arising prior to the Debtor's purchase of the Mall, are not chargeable to the Debtor. Liability for the BU & O taxes is likewise more properly relegated to the series of tax disputes between the City and Group to be resolved in another forum than it is a subject to be considered by this court in the course of administration of the Debtor's bankruptcy case.

There appears to be no dispute that the BU & O taxes are incurred on a monthly basis, and therefore accrue at the end of the month that they are unpaid. The City does not claim any liens securing these taxes.

The parties do disagree, however, about the nature of the BU & O taxes. Group and the Debtor assume that they are taxes within the scope of 11 U.S.C. § 507(b)(7)(C), which includes "a tax required to be collected or withheld and for which the debtor is liable in any capacity." The City, meanwhile, attaches an ordinance from the CODE, § 19–1806, which it claims takes the BU & O taxes out of the scope of § 507(b)(7)(C) because the said taxes are imposed directly on property owners if they fail to collect them from their tenants. *See* CODE, 19–1806(5)(b). However, there is no dispute that the BU & O taxes are to be collected from tenants by landlords, as agents for a local taxing authority. *Id.* Rather than *not* falling within the scope of § 507(a)(7)(C) because landlords may be liable if the BU & O taxes payable by their tenants are unpaid, § 507(b)(7)(C) applies *only* in the case of taxes for which the debtor *is* potentially liable, "in any capacity whatever." The only other prerequisite of § 507(b)(7)(C) taxes is that they be collected by the debtor for the taxing authority *in any manner.* Certainly, the BU & O taxes are collectible for the City by the Debtor, as well as being subject to being imposed upon the Debtor. Therefore, the dual elements that the debtor make collection of taxes for a local taxing authority and the incidence of the debtor's own potential liability of the taxes are unpaid are both features of the BU & O taxes, and place them squarely within the scope of § 507(b)(7)(C).

The City contends that post-petition BU & O claims are entitled to be classified as administrative, first priority claims under 11 U.S.C. §§ 503(b)(1)(B)(i), 507(a)(1) simply because the BU & O taxes are not within the scope of § 507(b)(7)(C). Interestingly, the City argues that its pre-petition BU & O taxes are somehow entitled to a § 507(a)(7) priority, never explaining how this can be so if BU & O taxes are not within the scope of § 507(a)(7)(C). We believe that, if we accepted the City's argument that the BU & O

taxes were not within the scope of § 507(b)(7)(C), the City would be placing itself in a worse position, because pre-petition BU & O tax liabilities of the Debtor would then have to be properly classified as general unsecured claims.

Group again concedes that post-petition BU & O taxes are administrative claims, although it asserts that the pre-petition BU & O taxes are within the scope of § 507(a)(7)(C). However, the Debtor argues that all of the BU & O taxes are properly classified as seventh priority claims under § 507(a)(7)(C), again basing its argument upon § 502(i). As we indicated at page 1019 *supra,* we found no merit in the Debtor's argument that § 502(i) rendered the City's 1994 real estate tax claims properly classifiable as seventh priority claims pursuant to § 507(a)(7)(B), as opposed to administrative claims. It is consistent with this result to refuse the Debtor's invitation to classify the post-petition BU & O taxes as seventh priority claims under § 507(a)(7)(C). We therefore again reject the Debtor's argument, and we will proceed to classify all of the City's claims as administrative, first-priority claims except the 1995 real estate taxes, which are not classified at all, but are labelled, at the City's request, as nondischargeable, post-confirmation obligations, apparently chargeable to Group.

4. *PURSUANT TO THE PROVISIONS OF THE CONFIRMED PLAN, THE CITY IS ENTITLED TO "FULL" PAYMENT OF ITS PRIORITY AND ADMINISTRATIVE CLAIMS, WHICH INCLUDES INTEREST TO DATE ON ALL CLAIMS EXCEPT THE 1993 REAL ESTATE TAX CLAIMS, REGARDING WHICH INTEREST IS TO CEASE ON AUGUST 15, 1994.*

 There is some conflict in the authorities as to what increments to the tax principal a taxing authority asserting seventh priority claims is entitled. The pertinent statutory provision, 11 U.S.C. § 507(a)(7)(G), limits the increments to "a penalty related to a kind specified in this paragraph and in compensation for actual pecuniary loss." We

agree with the conclusion of the court in *In re Garcia,* 955 F.2d 16, 18–19 (5th Cir.1992), that interest is a penalty imposed in compensation *for* actual pecuniary losses, and hence *is* collectible under § 507(a)(7)(G), but that additional penalties otherwise collectible, not being such compensation, are accordingly barred by § 507(a)(7)(G).

The Debtor and Group both cite *In re TOC Associates,* 181 B.R. 205, 208–09 (Bankr. E.D.Pa.1995) (FITZGERALD, J.), for the principle that even a penalty for a pecuniary loss, and particularly interest, is not collectible if the interest accrued post-petition. However, this conclusion of the *TOC* court is apparently based upon its reading of the confirmed plan in that case as providing for interest on pre-petition tax claims only. *Id.* The instant Plan appears more generous to the City than the plan at issue in *TOC.* With respect to Class 2 claims, which include the BU & O tax claims, when stripped of the surplusage relating to unachieved settlements, *see* page 1012 *supra,* the Plan provides that "[a]ll class 2 Allowed Claims shall be paid in full in Cash on the Effective Date or as soon as practicable thereafter." Again eliminating language relating to hoped-for but unconsummated settlements, the Plan provides, as to Class 3 claims, which embrace the real estate tax claims in issue, *see* page 1012 *supra,* that "real estate taxes will be paid in full in Cash on the Effective Date," with the exception of a particular provision relative to 1993 real estate tax claims. That provision expressly provides for interest on the 1993 real estate tax claims, but, for reasons not apparent to the court, cuts off its accrual as of August 15, 1994.

Two cases interpreting plan provisions which similarly provide for payment of seventh priority tax claims "in full," noting that plan ambiguities are interpreted against the debtor-draftsperson, *cf. In re St. Mary Hospital,* 155 B.R. 345, 348–49 (Bankr.E.D.Pa. 1993) (plans are construed as contracts; thus, alleged ambiguities in plans are interpreted by the same principles as are utilized in interpretation of alleged ambiguities in contracts), hold that seventh priority tax claimants are entitled to interest. *In re Arrow Air, Inc.,* 101 B.R. 332, 334–35 (S.D.Fla.

1989); and *In re Collins*, 184 B.R. 151, 154–56 (Bankr.N.D.Fla.1995). *Compare United States v. White Farm Equipment Co.*, 157 B.R. 117, 122 (N.D.Ill.1993) (interest denied where plan "explicitly defines an 'allowed claim' as not including any interest").

Therefore, we conclude that, except as to the 1993 real estate tax claims accruing after August 15, 1994, the City is entitled to interest on all of its seventh priority claims. The agreement of the Debtor, per the Plan, to pay the City's tax claims "in full" except as to post-August 15, 1994 interest on the 1993 real estate tax claims, also causes us to accept the City's calculation of the principal as including the "additions" to the discounted and base amounts of the real estate taxes as provided in the CODE, § 19–1303(3). It is only the "additional penalty" of one (1%) percent per month during the first year of delinquency, referenced in § 19–1303(4)(c), which we believe is excluded by the combined application of § 507(a)(7)(G) and the Plan.

■ There is also a conflict in the authorities as to what increments to the tax principal a taxing authority asserting a first-priority, administrative claim is entitled. The pertinent statutory authorities in this instance are §§ 503(b)(1)(B)(i), (b)(1)(C), which provide, in pertinent part, as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, ..., including—

(1)(A) ...

. . . . . .

(B) any tax—

(i) incurred by the estate, except a tax of a kind specified in section 507(a)(8) of this title; ...

(C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph; ...

The conflict arises as to whether interest, which is not enumerated in § 503(b)(1)(C), is therefore excluded. When juxtaposed within § 507(a)(7)(G), which logically allows interest but not additional penalties to seventh priority claimants, it seems illogical to grant administrative first priority claimants penalties and fines, which are additions to interest, but not interest itself.

Despite the anomaly created by disallowing interest to administrative claimants, and the presence of ample authority that interest *is* allowable to administrative claimants, particularly tax claimants, *see, e.g., In re Colortex Industries, Inc.*, 19 F.3d 1371, 1374–84 (11th Cir.1994); *In re Flo–Lizer, Inc.*, 916 F.2d 363, 366–67 (6th Cir.1990); *In re Mark Anthony Construction, Inc.*, 886 F.2d 1101, 1108 (9th Cir.1989); *In re Allied Mechanical Services, Inc.*, 885 F.2d 837, 839 (11th Cir. 1989); *United States v. Friendship College, Inc.*, 737 F.2d 430, 432–33 (4th Cir.1984); and *In re F.A. Potts & Co.*, 114 B.R. 92, 93–94 (Bankr.E.D.Pa.1990) (TWARDOWSKI, J.), this court, in *In re American Int'l Airways, Inc.*, 77 B.R. 490, 494–95 (Bankr. E.D.Pa.1987), stated, in dicta, that the omission of interest as an allowable aspect of an administrative claim from § 503(b) strongly suggested that interest should ordinarily be excluded as an appendage to an administrative claim. *Accord, In re Luker*, 148 B.R. 946, 949–53 (Bankr.N.D.Okla.1992).

The issue of whether interest is generally collectible by an administrative claimant, in the absence of the directives from the terms of a confirmed plan, is an issue we need not squarely confront here. As noted from our discussion at page 1021 *supra*, the instant confirmed Plan contemplates payment of all Class 2 and Class 3 claims "in full." We are not inclined to read § 503(b)(1)(C) as an absolute bar to collection of interest to administrative claimants, as is the bar on penalties imposed by § 507(a)(7)(G) as to seventh priority claimants. Therefore, we conclude that the City is entitled to interest as well as penalties on account of its administrative 1994 real estate tax and post-petition BU & O tax claims under the terms of the Plan at issue here.

5. *CALCULATION OF THE CITY'S CLAIMS.*

In calculating the precise sums of the City's claims, we begin from the general observation that O'Donnell and Arthur, the City's witnesses regarding the amount of the real estate taxes and BU & O taxes owed,

respectively, were candid and even-handed, and hence highly credible in their presentations. No adverse witnesses, except, to a limited degree, Krouk, were presented to rebut their testimony. In fact, all of the witnesses for the objectors except Krouk, and he only in small part, focused on one issue which we ultimately find unnecessary to decide, i.e., the alleged impropriety of charging the 1988 and 1989 tax claims against the Debtor. See pages 1015–1017 & n. 2 supra. Moreover, Krouk disclaimed any hypothesis of his own as to the amount which the taxes should be, testifying only as to the BU & O taxes and noting that Arthur had sat down with him and agreed to make adjustments as a result of their discussion. Arthur, meanwhile, testified that she had indeed made adjustments after meeting with Krouk and that the resulting figures were those asserted by the City as adjusted. Given the reasonableness of the City's approach, we find ourselves inclined to accept the figures proffered by O'Donnell and Arthur as accurate, except where proven inaccurate and subject to necessary adjustment.

As to the 1993 real estate taxes, we will therefore begin with the $132,062.02 figure cited as "principal" by O'Donnell. The City proposes addition of interest totalling $13,206.20 through August 1, 1995, which is the amount which would accrue if interest at half of one (½%) percent per month, pursuant to CODE § 19–1303, were accrued for twenty (20) months. However, the accrual of penalty over the twelve (12) months after August 1994 has been effectively taken from the City by the applicable Plan provision. Therefore, this amount must be reduced by half of one (½%) percent per month for twelve (12) months, or by $7,923.72. The charge to record the said lien must also be deducted, since no liens could validly be recorded due to the presence of the automatic stay. The 1993 real estate tax claim therefore nets at $132,062.02, plus $13,206.20 less $7,923.72, or $137,344.50.

As to the 1994 real estate taxes, we will allow the full amount of principal, interest, and penalty claimed, deducting only a $20 lien recording charge from the total sought.

The 1994 real estate tax liability is therefore allowed in the amount of $145,588.84.

Calculation of the BU & O taxes due requires somewhat more mathematical calculations, but is relatively simple to formulatize. We will allow, as principal, all "tax due" from April 1990 and thereafter, which by our calculation comes to $60,580.48. Of this amount, per our calculations, $38,691.09 of principal fell due from September 1993 forward, and the remainder of $21,889.39 fell due between April 1990 and August 1993. Arthur testified that the sum referenced as "interest" on the City's BU & O records was actually one-third interest and two-thirds penalty. Hence, for the period from April 1990 through August 1993, representing the pre-petition BU & O tax liability, two-thirds of the interest claimed is properly classifiable as a non-compensable "penalty" which is excluded from collection by § 507(a)(7)(G). We will therefore allow the City one-third of all of the "interest" claimed on its records which fell due in the period between April 1990 and August 1993. This figure comes to $5,715.46 according to our calculations. The entire amount of "interest" claimed from September 1993 and thereafter, which we calculate to be $4,616.58, is also payable under the terms of the Plan and § 503(b)(1)(C). We will therefore allow the City $27,604.85 as a seventh priority claim and $43,307.67 as a first priority administrative claim, a total of $70,912.52, on account of its BU & O tax claims.

### D. CONCLUSION

An Order consistent with the conclusions and calculations presented hereinbefore will be entered.

### ORDER

AND NOW, this 31st day of August, 1995, after a hearing of July 19, 1995, on the Objections of Mall at One Group, L.P. ("Group") to Proofs of Claim Nos. 2 and 3 ("the Objections") filed by the City of Philadelphia ("the City"), joined by the Debtor and the Bank of New York—National Community Division, and attempted to be joined by First American Title Insurance Co., it is

hereby ORDERED AND DECREED as follows:

1. The Objections are SUSTAINED in part.

2. The City is allowed priority claims, in the following amounts:

a. $137,344.50 on account of 1993 real estate taxes, pursuant to § 507(a)(7).

b. $145,588.84 on account of 1994 real estate taxes, pursuant to § 507(a)(1).

c. $27,604.85 on account of business occupancy and use ("BU & O") taxes accruing between April 1990 and August 1993, pursuant to § 507(a)(7).

d. $43,307.67 on account of BU & O taxes accruing between September 1993 and the present, pursuant to § 507(a)(1).

3. All claims for taxes accruing prior to April 1990 and the claims for 1995 real estate taxes are excluded, it appearing that such claims are more appropriately asserted by the City against Group directly in other forums.