### In re PRECISION CONCEPTS, INC., Debtor.

#### No. 02–51581.

United States Bankruptcy Court,
M.D. North Carolina,
Winston–Salem Division.

Feb. 23, 2004.

Gregory Byrd Crampton, Stephani Wilson Humrickhouse, Raleigh, NC, for Debtor.

Jeffrey E. Oleynik, Greensboro, NC, for Committee of Unsecured Creditors.

## MEMORANDUM OPINION

CATHARINE R. CARRUTHERS, Bankruptcy Judge.

THIS MATTER came on for hearing before the undersigned bankruptcy judge on December 17, 2003, upon the Objection by the Debtor to Claim No. 115 of Forsyth County Tax Collector. Gregory B. Crampton appeared on behalf of the Debtor and Robert E. Price, Jr. appeared on behalf of the Forsyth County Tax Collector. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2). The Court, after receiving the testimony and the exhibits and reviewing the file, makes the

following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FACTS

Precision Concepts, Inc. (the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on June 19, 2002 (the "Petition Date"). Prepetition, the Debtor had been in the business of manufacturing stamping and insert molding for the telecom industry. The Debtor had been in business for at least 12 years and employed approximately 85 individuals on the Petition Date. The schedules reflected that the Debtor owned, among other items, unimproved real estate in Davie County, North Carolina, valued at $275,000.00 and machinery, fixtures, equipment and supplies used in the business valued at $19,309,308.08. The net book value of the machinery and equipment was listed at $13,000,000.00.

The Debtor had numerous secured creditors listed on its Petition Date including: Bank of America, NA which held a first lien upon all of the Debtor's assets securing obligations of the Debtor in the principal amount of $4,902,371.91; General Electric Credit Corporation, as a lessor, which held a properly perfected security interest in certain machinery and equipment securing an indebtedness having an approximate balance on the Petition Date of $3,119,000.00; Bank of America Leasing & Capital LLC, secured by various equipment with an approximate balance on the Petition Date of $2,109,000.00; Wells Fargo Equipment Finance, Inc., secured by various equipment with an approximate balance on the Petition Date of $404,800.00; and BB & T Leasing Corporation, secured by various equipment having an approximate balance on the Petition Date of $277,000.00. All of the business equipment was located in Forsyth County, North Carolina. The Debtor has never owned real property in Forsyth County.

The Debtor first came to the attention of the Forsyth County Tax Collector ("Tax Collector") sometime in the year 2000. At that time, it was discovered that the Debtor had never listed its business personal property (the "Property") for taxation in Forsyth County, contrary to North Carolina law. Despite repeated written contact from the Tax Collector during that year, the Tax Collector did not receive a business personal property listing from the Debtor that year.

In the year 2001, after correspondence with the Tax Collector and receipt of an extension of time, the Debtor filed its business personal property tax listing. The Debtor disclosed that it had been operating its business in Forsyth County since 1990 and listed more than $10,000,000.00 in business personal property (at cost), of which approximately $3,000,000.00 had been acquired in the year 2000. The Debtor failed to cooperate with the Tax Collector's request for an audit. On November 21, 2001, the Tax Collector assessed the property at a value of $6,495,580.00 and imposed taxes for the preceding five years (1996–2001)[1] in the total amount of $297,479.83.[2] This amount included late listing penalties computed at 10 percent of the amount of the tax for each year that property was not listed pursuant to N.C.

---

1. N.C. Gen.Stat. § 105–312 creates a presumption that newly discovered property should have been listed by the taxpayer for the preceding five years unless the taxpayer can show otherwise.

2. The tax rate for Forsyth County during time period at issue ranged from .007264 to .0064. The tax rate for the City of Winston–Salem during time period at issue ranged from .0059 to .0046.

Gen.Stat. § 105–312. *See* N.C. Gen.Stat. § 105–312.

The Debtor was billed for these personal property taxes on December 24, 2001. The tax bill indicated that payment was last due and payable without interest on or before January 5, 2002. The Debtor entered into a payment plan with the Tax Collector to pay $10,000.00 per month, but made only two payments in accordance with this plan, with the last payment on April 15, 2002. Therefore, on June 17, 2002, the Tax Collector attached two bank accounts of the Debtor. Two days later, the Debtor filed its bankruptcy petition, listing the Tax Collector as a creditor in the amount of $273,643.00.

After the bankruptcy filing, the Debtor continued its business under the protection of the bankruptcy court pursuant to 11 U.S.C. § 1107. On July 10, 2002, the Tax Collector filed a priority claim in the amount of $273,642.94. Approximately one year later, June 10, 2003, the Tax Collector amended its claim to include the Debtor's 2002 taxes in the amount of $91,511.68. The 2002 taxes became due post petition and were filed as a prepetition priority claim, resulting in a total claim of $365,154.62.

On June 21, 2002, the Debtor filed a motion to approve an agreement to sell assets (the "Sale Motion") to TCMS, Inc. ("TCMS"), a subsidiary of Teradyne, Inc. Teradyne Inc. was the Debtor's largest customer, with approximately 80% of the Debtor's total business activity and revenues. The Asset Purchase Agreement between the Debtor and TCMS provided for the sale of substantially all of the Debtor's assets including machinery, equipment, inventory, spare parts, and the account receivable of Teradyne Inc.'s, not to exceed $400,000.00. Excluded assets, which the Debtor estimated to have a value of $1,700,000.00, included cash, the unimproved real estate located in Davie County, non-Teradyne receivables and non-assigned contract rights. The purchase price was $8,402,000.00 in cash. Each of the secured creditors agreed to accept a portion of the sale proceeds in full satisfaction and release of deficiency claims exceeding $2,000,000.00.

In a separate transaction, TCMS agreed to sell certain equipment that it purchased from the Debtor to Precision Concepts Group ("PCG"), a new entity formed by the President and sole shareholder of the Debtor, in return for a $1,500,000.00 note. In settlement of several objections, the sale agreement included a guaranty from PCG that the Debtor's estate would receive a minimum of $1,700,000.00 from the receivables and the cash in the Debtor's estate as of the closing of the sale.

During the post petition period prior to the sale, substantially all of the Debtor's gross income and revenues were derived from the continued operation of the business. The Debtor's monthly reports for the time period during which the Debtor operated the business reflect a net sales for the partial month on June 2002 of $593,762.00; July 2002 of $1,855,284.00 and August 2002 of $895,518.00 and net income for June 2002 in the amount of $9,958.00, July 2002 in the amount of $495,024.00, and August 2002 in the amount of $521,232.00. Furthermore, these same monthly reports reflect ending cash balances for June 2002 in the amount of $334,011.00, July 2002 in the amount of $408,275.00, and August 2002 in the amount of $1,353,284.00.

This court approved the sale by Order date August 9, 2002 (the "Sale Order"), finding that the terms and conditions were fair, reasonable, and in the best interests of the Debtor, its estate and its creditors. The terms of the § 363 sale provided for the Debtor's estate to retain all cash in the

Debtor's operating account as of the closing of the sale, less the sum of payments for payroll and accounts payable incurred prior to the closing, such that the estate received the benefit of the increase in the cash balance of the Debtor.

On May 13, 2003, the Debtor filed an objection to the Claim of the Tax Collector on the basis that the Claim should be disallowed in its entirety pursuant to 11 U.S.C. § 502(b)(3) because the Claim exceeds the value of the interest of the estate in such property. Alternatively, the Debtor contends that if the Claim is allowed, the Tax Collector's Claim is unsecured and not entitled to priority under § 507(a)(8).

## DISCUSSION

### A. SECTION 502(b)(3)

■ Pursuant to 11 U.S.C. § 502(a), a proof of claim filed under § 501(a) is deemed allowed unless a party in interest objects. When filed in accordance with § 501, Rule 3001(f) of the Federal Rules of Bankruptcy Procedure provides that a proof of claim is entitled to prima facie validity. Fed. R. Bankr.P. 3001(f). The burden of proof then falls upon the objecting party to overcome the presumed validity and amount of the claimant's claim. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir.1992). If the objecting party succeeds in overcoming the prima facie effect, the ultimate burden lies with the claimant. *Id.* The court finds that the Debtor has carried its burden to overcome the prima facie effect and that the Forsyth County Tax Collector must prove validity of its claim by a preponderance of the evidence.

■ Section 502(b)(3) provides as follows:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that...

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

11 U.S.C. § 502(b)(3). If a claim is disallowed under § 502(b)(3), it is disallowed for all purposes and the claimant will not be entitled to a distribution of any funds from the estate, even if there are funds available for distribution. *See In re Milit, Inc.*, 231 B.R. 604, 605–06 (Bankr. W.D.Tex.1999). Section 502 does not apply to post petition taxes, which are governed instead by § 503 and § 507.

In discussing the underlying purpose of § 502(b)(3), Collier on Bankruptcy states that:

The purpose of this section is to prevent the depletion of the debtor's estate by the payment of taxes assessed against property that has no value to the estate and is likely to be abandoned by the trustee. This section is designed to prevent injustice to unsecured creditors and to prevent a windfall to mortgagees and other lienors who would unfairly benefit from the payment of property taxes that would otherwise remain charges on the property.

4 COLLIER ON BANKRUPTCY, 502.03[4], at 502–34 (15th ed.1999). *See also In re Damar Machine, Inc.*, 30 B.R. 256, 257–58 (Bankr.D.Me.1983). In *In re Skinner Lumber Co.* the court further explained that § 502(b)(3) was:

Congress' response to a situation which often saw estates almost entirely depleted by taxes to the detriment of unsecured creditors in spite of the fact that

such property was often thereafter abandoned to mortgagees or the taxing authorities. This was so because such taxes were construed, under many state statutes, to be taxes legally due and owing by the bankrupt personally although they may have been liens on the real estate as well. The injustice of such payments was apparent since the payment of taxes from the bankrupt estate would have the effect of clearing away tax claims which otherwise would have remained charges on the real estate in the hands of the mortgagees or the tax sale purchasers.

*In re Skinner Lumber Co.*, 35 B.R. 31, 32 (Bankr.D.S.C.1983). If the estate had been required to pay the taxes in *Skinner*, the secured creditors would have received a windfall, as the estate would have paid a tax claim that would have remained charges on the real property in the "hands of the mortgagees or the tax sale purchasers." *Id.* Finally, in examining the purpose of § 502(b)(3), this court must bear in mind "Congress' historic concern for the collection of taxes due and owing to national, state and local governments." *Lawler v. Henrico County*, 636 F.2d 68 (4th Cir. 1980) (holding that, under the Bankruptcy Act, the taxing authority was allowed a general unsecured claim rather than a priority claim because no interest in the taxed property passed to the bankruptcy estate).

In North Carolina, property taxes assessed on personal property constitute a lien on real property within the county or municipality as of the listing date. *See* N.C. Gen.Stat. § 105–355(a). It is undisputed that if the Debtor had owned real property in Forsyth County, the personal property taxes would have attached to the real property and constituted a first lien on the real estate, which would have been sold subject to the taxes. In as much as the Debtor did not own any real property in Forsyth County, these taxes will not

remain "charges on the real estate in the hands of the mortgagees or the tax sale purchaser." Nevertheless, § 502(b)(3) does not distinguish between real and personal property taxes.

■ The Debtor contends that the words "the value of the interest of the estate in such property" refer to equity in a debtor's property, and that ad valorem tax claims must be disallowed to the extent they exceed a debtor's equity in the property subject to the tax. The Debtor contends that if the personal property is over encumbered, there is no equity and, therefore, no value and no claim for any taxes. The Debtor points out that, in this instance, upon the closing of the TCMS sale no proceeds were paid to the Debtor. Because the sale proceeds were paid at closing by TCMS directly to the secured creditors, the Debtor contends that the court, in effect, determined that the value of the Debtor's personal property was less than the claims of perfected secured creditors. Therefore, the Debtor argues that the Debtor's equity in the Property against which the Tax Collector's claims are assessed is zero. As such, the Tax Collector's Claim should be disallowed in its entirety.

The Debtor relies primarily upon *In re Spruill*, 78 B.R. 766 (Bankr.E.D.N.C.1987), to support its argument. In that case, the debtors, who were farmers, owned farmland which was subject to two mortgages. Within a few months of the petition date, the holders of both mortgages filed motions for relief from stay. The parties entered into a consent order which provided for the automatic lifting of the stay if the debtors were unable to sell the property within a certain period of time. The consent order included a finding that the debtors had no equity in the property. Ultimately, the debtors were unable to sell

the property, and the secured creditors initiated foreclosure proceedings. Upon the completion of the foreclosure, the secured creditors paid the taxes and then filed an unsecured claim as a subrogee of the taxing authority. Based upon the fact that both secured creditors asserted deficiency claims and that the consent order contained a finding that the debtors had no equity in the property, the court found the value of the debtor's interest in the property was zero. *Id.* at 768. Citing other cases in which courts have disallowed tax claims when the property has been repossessed, abandoned or foreclosed upon, the court found that because the estate's interest in the property subject to the tax was zero, the tax claim must be disallowed. *Id.* at 770.

Numerous courts have applied § 502(b)(3) to disallow property tax claims in cases in which the property subject to the tax was repossessed, abandoned or foreclosed upon, leaving the estate with no interest in the property. *See In re Damar Machine, Inc.*, 30 B.R. 256 (Bankr.D.Me. 1983) (property upon which personal property taxes were assessed was repossessed five months before the petition date); *In re Skinner Lumber Co.*, 35 B.R. 31 (Bankr. D.S.C.1983) (estate's interest in the property is valueless because the property was abandoned); *In re Transco Corp.*, 11 B.R. 310 (Bankr.N.D.Tex.1981) (property foreclosed upon, leaving estate with no interest); *In re Davis*, 11 B.R. 621 (Bankr. N.D.Tex.1981) (where there was no interest of the estate in and to the property against which taxes are assessed, the tax claim must be disallowed). In these instances, the estate was left with no interest in the property on which the tax is assessed, therefore the interest is of no value. *In re Damar Machine, Inc.*, 30 B.R. at 257. This court has not found a case in which § 502(b)(3) was applied to bar tax claims on business personal prop-

erty sold as part of a successful § 363 sale after a period of operation which generated income for the estate.

Recently, the Fifth Circuit Court of Appeals addressed the issue of whether § 502(b)(3) barred claims for ad valorem business personal property taxes that were in excess of the total value of assessed property. *See In re Universal Seismic Associates, Inc.*, 288 F.3d 205, 208 (5th Cir.2002). The court held that the "value of the interest of the estate" refers to the gross value of the property that entered into the bankruptcy estate. *Id. See also In re Milit, Inc.*, 231 B.R. 604, 607–08 (Bankr.W.D.Tex.1999). In *In re Mall at One Associates, L.P.*, 185 B.R. 1009 (Bankr.E.D.Pa.1995), the Debtor objected to several tax claims after a proposed sale pursuant to a confirmed plan fell through. The property subject to tax, an over encumbered mall, was auctioned and sold to a secured creditor upon a credit bid. The court reasoned that the estate's interest in the assessed property led to the confirmation of the plan, and concluded that "lack of equity is not the equivalent of valuelessness." *Id.* at 1015.

In this case, the Property subject to the tax was the centerpiece of a successful § 363 sale. The Debtor listed the value of the business equipment on its sworn schedules at $21,145,349.15. In the Debtors' initial motion for authority to use cash collateral, the Debtor listed the value of the business equipment at $13,000,000.00. The Property was assessed by the claimant at a value of $7,008,630.00 and the purchase price under the § 363 sale (including other assets) was in excess of $8,000,000.00. The use of the Property during the Chapter 11 proceeding generated $3,346,564.00 in net sales, resulting in an increase in cash in excess of $1,000,000.00 and a substantial benefit to the Debtor's estate.

This is not a situation in which the Debtor's estate will be depleted by the payment of taxes assessed against property that had no value, resulting in an injustice to unsecured creditors and a windfall to the secured creditors; nor is this a situation where the taxing authority is requesting to be paid taxes on property that never came into the estate or for property abandoned out of the estate. Here, the taxing authority is requesting to be paid taxes on the very property that led to the filing of this case and that was essential to the continued operation of the company, resulting in realization of income and a successful § 363 sale. The use of this equipment resulted in positive cash flow to the company in an amount of approximately $1,000,000. The fact that the property was over encumbered does not mean that the property was of no value. *See In re Farris* 205 B.R. 461 (Bankr.E.D.Pa.1997) (where trustee operated property and the estate generated income, taxes were a claim against the estate); *In re Pioneer Title Building, Ltd.,* 133 B.R. 822 (Bankr. W.D.Tex.1991) (post petition operations of the taxed property by the Debtor generated a profit which gave value to the interest of the estate in such property); *In re Erie Hilton Joint Venture* 125 B.R. 140 (Bankr. W.D.Pa.1991) (income from property value to the estate). The amount of equity in the property is not the determining factor. The determining factor is whether the tax "claim exceeds the value of the interest of the estate in such property."

This court finds that the value of the interest of the estate in this Property exceeds $365,154.62 (the amount of the Claim). The estate clearly benefitted from the ownership and use of the Property. Without the Property, net proceeds of approximately $1,000,000.00 would never have been realized. The Debtor's estate had full use of the Property after the Petition Date, continued to operate the Property, thereby allowing for the possibility of a sale as a going concern, and sold the Property on very favorable terms. As stated previously, according to the monthly reports, during the months of July and August 2002, the estate generated net income of $1,016,256.00. Thus, the estate received the value of the profit generated by the operation of the Property.

Not only did the Property provide a significant benefit to the estate as a whole, but provided a very tangible and substantial benefit to the unsecured creditors. The Unsecured Creditors' Committee objected to the Sale Motion based on the amount available to unsecured creditors in this case. This objection was settled pursuant to an agreement that the estate would retain at least $1,700,000.00 in cash and receivables. The Debtor's cash balance, much of which had been generated during the bankruptcy, increased from $334,011.00 on the Petition Date to $1,353,284.00 at the end of August 2002. The Sale Order required the waiver of any deficiency claims by the secured creditors. Therefore, the $1,700,000.00 in cash and receivables was available for distribution pursuant to a plan. But for the Property at issue here, this money would not have been available to distribute to the unsecured creditors. Therefore, it is clear that the assessed Property not only came into the estate, but that the Debtor's interest in this Property had a value in excess of the Tax Collector's Claim. Because the Tax Collector's Claim exceeded the value of the interest of the estate in the Property, the court finds that § 502(b)(3) is not applicable.

**B. SECTION 507(a)(8)**

█ The Debtor contends that if allowed, the Tax Collector's Claim is unsecured and not entitled to priority treatment under § 507(a)(8)(B). Section

507(a)(8)(B) provides priority for "allowed unsecured claims of governmental units, only to the extent that such claims are for—a property tax assessed before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition." 11 U.S.C. § 507(a)(8). To qualify for priority under this subsection, the tax must have been: (1) assessed prior to the petition date; and (2) payable without penalty sometime within the year before the bankruptcy was filed. In this case, the parties do not dispute that the property taxes were assessed before the commencement of the case as required by this subsection.[3] The only issue is whether the property taxes were last payable without penalty within one year of the Petition Date.

Pursuant to N.C. Gen.Stat. § 105–285, all personal property subject to ad valorem taxation must be listed annually. The value, ownership, and place of taxation of personal property is determined annually as of January 1. N.C. Gen.Stat. § 105–285. The listing period for each year begins on the first business day of January and ends on January 31. N.C. Gen.Stat. § 105–307. "Discovered property" is property not properly listed during the regular listing period. N.C. Gen.Stat. § 105–312. When property is discovered, the total tax for the preceding five years is deemed to be a tax for the fiscal year in which the property was discovered. N.C. Gen.Stat. § 105–31(g). In addition, penalties are computed and imposed as follows:

> Having computed each year's taxes separately as provided in subsection (g) of this section, there shall be added a penalty of ten percent (10%) of the amount of the tax for the earliest year in which the property was not listed, plus an additional ten percent (10%) of the same amount for each subsequent listing period that elapsed before the property was discovered. This penalty shall be computed separately for each year in which a failure to list occurred; and the year, the amount of the tax for that year, and the total of penalties for failure to list in that year shall be shown separately on the tax records; but the taxes and penalties for all years in which there was a failure to list shall be then totaled on a single tax receipt.

Under North Carolina law, the listing of taxes and the payment of taxes are separate and distinct requirements. Section 105–360 provides that taxes are "due and payable on September 1 of the fiscal year for which the taxes are levied. Taxes are payable at par or face amount if paid before January 6 following the due date. Taxes paid on or after January 6 following the due date are delinquent and are subject to interest charges." N.C. Gen.Stat. § 105–360.

In the present case, when the Debtor failed to list its business personal property for taxation as required by N.C. Gen.Stat. § 105–285, the Tax Collector discovered the property and calculated the taxes for the preceding five years, 1996 through 2001. A late listing penalty of 10 percent of the tax due was added for each year the property was not listed and payment was due on January 5, 2002. In addition, the Debtor's 2002 business personal property listing was received late, on May 6, 2002, therefore, a 10 percent late listing penalty was added to the tax bill for that year as well.

---

**3.** Under North Carolina law, the pivotal event for determining when ad valorem property tax is incurred is the listing date, which is January 1 of each year, even if amount of tax is yet to be determined. *See In re Members Warehouse, Inc.,* 991 F.2d 116 (4th Cir.1993). *See also* N.C. Gen.Stat. § 105–285(b).

Under these facts, the property taxes for the years 2002 and 2001 are entitled to priority under § 507(a)(8)(B). The Debtor filed its bankruptcy petition on June 19, 2002, therefore the tax for that year was incurred on January 1, 2002 and last payable without penalty after one year before the date of the filing of the petition. In fact, pursuant to § 105–360, those taxes were not "due and payable" until sometime between September 1, 2002 and January 5, 2003, several months after the Petition Date. Similarly, pursuant to § 105–360, the 2001 taxes were not "due and payable" until September 1, 2001, and were payable at face amount until January 6, 2002, approximately six months prior to the Petition Date and well within the year prior to the Petition Date.

As for the remainder of the taxes, those taxes were not payable without penalty after one year before the date of the filing of the petition. Therefore, the taxes for the years 1996, 1997, 1998, 1999, and 2000 are not entitled to priority under § 507(a)(8)(B).

For the reasons stated herein, the court finds that the taxes due for the years 2002 and 2001 are entitled to priority treatment pursuant to § 507(a)(8)(B). The remainder of the Claim shall be allowed as a general unsecured claim. An Order will be entered consistent with this Memorandum Opinion.